# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

STATE OF ILLINOIS et al.,

     Defendants.

No. 3:25-cv-01691-DWD

Honorable David W. Dugan

## <u>DEFENDANTS' MOTION TO DISMISS</u>

KWAME RAOUL
Illinois Attorney General

Darren Kinkead
Aleeza Strubel
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ...................................................................................................... 6

I.      The anticommandeering doctrine recognizes that Congress has no power to issue
        orders directly to the states. ...................................................................... 7

II.     A federal law that violates the anticommandeering doctrine by issuing orders
        directly to the states does not preempt state law. ................................... 10

III.    Section 1623(a) violates the anticommandeering doctrine and therefore does not
        preempt the challenged state laws .......................................................... 12

        A.      Section 1623(a) regulates states rather than private actors. .................. 12

        B.      Even if section 1623(a) regulates private actors, it still violates the
                anticommandeering doctrine because it also issues a direct order to states. ........ 16

        C.      Applying the anticommandeering doctrine to section 1623(a) promotes our
                nation's commitments to individual liberty and political accountability. ............. 17

CONCLUSION ................................................................................................. 18

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*,
    567 U.S. 387 (2012)..................................................................................... 13

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015)..................................................................................... 10

*Brackeen v. Haaland*,
    994 F.3d 249 (5th Cir. 2021) ...................................................................... 10

*Chicago v. Sessions*,
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ........................................................... 9

*Day v. Bond*,
    500 F.3d 1127 (10th Cir. 2007) .................................................................. 15

*Department of Homeland Security v. Regents of the University of California*,
    591 U.S. 1 (2020) ....................................................................................... 17

*FCC v. Consumers' Research*,
    606 U.S. 656 (2025)................................................................................... 14

*Haaland v. Brackeen*,
    599 U.S. 255 (2023)................................................................................... 14

*Hulce v. Zipongo Inc.*,
    132 F.4th 493 (7th Cir. 2025) .................................................................... 15

*Kansas v. Garcia*,
    589 U.S. 191 (2020)................................................................................... 10

*McHenry County v. Raoul*,
    44 F.4th 581 (7th Cir. 2022).........................................................11, 12, 13

*Murphy v. NCAA*,
    584 U.S. 453 (2018)......................................2, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17

*Neitzke v. Williams*,
    490 U.S. 319 (1989)..................................................................................... 5

*New York v. United States*,
    505 U.S. 144 (1992).........................................................7, 8, 9, 11, 13, 16, 17

*Ocean County Board of Commissioners v. Attorney General*,
8 F.4th 176 (3d Cir. 2021) ...........................................................................11, 13

*Papasan v. Allain*,
478 U.S. 265 (1986)......................................................................................... 5

*Plyler v. Doe*,
457 U.S. 202 (1982)...................................................................................... 2, 17

*Printz v. United States*,
521 U.S. 898 (1997) ............................................................................ 8, 9, 10, 17

*Reno v. Condon*,
528 U.S. 141 (2000).......................................................................................11, 13

*Travis v. Reno*,
163 F.3d 1000 (7th Cir. 1998) ......................................................................... 16

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ......................................................................... 9, 17

*United States v. Illinois*,
No. 25 C 1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) ................................. 6, 9, 18

*United States v. Illinois*,
No. 25 C 4811, 2025 WL 2401304 (N.D. Ill. Aug. 19, 2025) ................................. 6, 13

*Young Conservatives of Texas Foundation v. Smatresk*,
73 F.4th 304 (5th Cir. 2023) ........................................................................... 15

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 4................................................................................ 13

**Statutes**

8 U.S.C. § 1373 ................................................................................................ 9

8 U.S.C. § 1621 ................................................................................................ 16

8 U.S.C. § 1623 ........................................................................................... 3, 6, 12

110 ILCS 305/7e-5........................................................................................ 3, 4, 6, 14

110 ILCS 520/8d-5......................................................................................... 3, 4

110 ILCS 660/5-88 ........................................................................................... 3, 4

110 ILCS 665/10-88 ......................................................................................... 3, 4

110 ILCS 670/15-88 ............................................................................................ 3

110 ILCS 675/20-88 ......................................................................................... 3, 4

110 ILCS 680/25-88 ......................................................................................... 3, 4

110 ILCS 685/30-88 ............................................................................................ 3

110 ILCS 690/35-88 ............................................................................................ 3

110 ILCS 805/6-4a ........................................................................................... 3, 4

110 ILCS 947/35 .................................................................................................. 4

110 ILCS 947/67 .............................................................................................. 5, 6

110 ILCS 986/10 .............................................................................................. 4, 6

110 ILCS 986/15 .............................................................................................. 4, 5

**Other Authorities**

*Black's Law Dictionary*, "Eligible" .............................................................. 14

Northwestern University, "Tuition and Fees," admissions.northwestern.edu/tuition-
    aid/#tuition ................................................................................................ 14

U.S. Census Bureau, "Annual Estimates of the Resident Population for the United States,
    Regions, States, District of Columbia, and Puerto Rico: April 1, 2020 to July 1,
    2024" ........................................................................................................... 1

U.S. Department of Homeland Security, "Estimates of the Unauthorized Immigrant
    Population Residing in the United States: January 2018–January 2022" ......................... 1

U.S. Department of Justice, "The Justice Department Files Complaint Challenging
    Illinois Laws Providing In-State Tuition and Scholarships for Illegal Aliens,"
    justice.gov/opa/ pr/justice-department-files-complaint-challenging-illinois-laws-
    providing-state-tuition-and ....................................................................... 1

University of Chicago, "Undergraduate Costs," financialaid.uchicago.edu/undergraduate/
    how-aid-works/undergraduate-costs/ ............................................................. 14

## INTRODUCTION

Illinois is home to outstanding community colleges and universities that offer an impressive array of vocational and educational opportunities to students from every walk of life. Illinois is also home to unauthorized immigrants: around 420,000 according to the federal government's most recent estimate, which is about 3.8 percent of the total population of unauthorized immigrants living in this country.[1] Around 27,000 of those unauthorized immigrants are enrolled in an Illinois community college or university. ECF 1 at 19, ¶ 67.

For almost a quarter of a century, undocumented students with strong ties to Illinois have enjoyed many of the same opportunities to pursue higher education as their friends and neighbors who are American citizens. Today, for example, an undocumented student who attended an Illinois high school for four years and has earned her diploma may be eligible for in-state tuition at a state community college or university. She also may be eligible for financial aid and other educational benefits that the state offers to deserving students.

It is both rational and just for Illinois to ensure that undocumented students can improve their personal and professional prospects at the state's renowned institutions of higher education. As the Supreme Court recognizes, "education has a fundamental role in maintaining the fabric of our society" because it "provides the basic tools by which individuals might lead economically

---

[1] U.S. Department of Homeland Security, "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022" at 5, *available at* ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf. About the same proportion of the total American population resides in Illinois (3.7 percent) according to the federal government's most recent estimate, U.S. Census Bureau, "Annual Estimates of the Resident Population for the United States, Regions, States, District of Columbia, and Puerto Rico: April 1, 2020 to July 1, 2024," *available at* census.gov/programs-surveys/popest/tables/2020-2024/state/totals/NST-EST2024-POP.xlsx, which is at odds with the local United States Attorney's baseless accusation that Illinois is running "a 'race to the bottom' as the country's leading sanctuary state," U.S. Department of Justice, "The Justice Department Files Complaint Challenging Illinois Laws Providing In-State Tuition and Scholarships for Illegal Aliens," justice.gov/opa/pr/justice-department-files-complaint-challenging-illinois-laws-providing-state-tuition-and.

productive lives to the benefit of us all." *Plyler v. Doe*, 457 U.S. 202, 221 (1982). Our communities suffer "significant social costs" when undocumented students "are denied the means to absorb the values and skills upon which our social order rests." *Id.* And it would be particularly opprobrious to deny these opportunities to undocumented students who came to this country as children and therefore could "'affect neither their parents' conduct nor their own status.'" *Id.* at 220. It ought to go without saying that "directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice." *Id.*

The federal government takes a different view. As it sees things, the Illinois laws that make undocumented students eligible for higher education benefits are "flagrant[ ]" "discrimination against Americans." ECF 1 at 1, ¶ 1. The federal government insists that these laws are therefore "prohibited and preempted by federal law." *Id.* at 2, ¶ 2.

But the federal government's position runs headlong into our Constitution. The federal law at issue is not a valid preemption provision because it functions as a direct order to state legislatures forbidding them to enact laws that make undocumented students eligible for educational benefits. Congress possesses "only certain enumerated powers"; "all other legislative power is reserved for the States." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). "And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.* In other words, a federal law that issues direct orders to the states exceeds Congress's constitutional authority to legislate. And a federal law enacted without congressional authority cannot serve as a basis to preempt state law.

This litigation is yet another attempt by the federal government to commandeer Illinois officials and force them to toe the line on its preferred immigration policies. Our Constitution forbids this. The federal government's claims must therefore be dismissed.

2

## BACKGROUND

The federal government contends that various Illinois laws authorizing higher education benefits are preempted by 8 U.S.C. § 1623(a), which provides:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

The challenged Illinois laws fall into three groups described in more detail below. *First*, certain students who attended an Illinois high school are eligible for the same tuition rate charged to state residents at Illinois community colleges and universities. *Second*, those students are also eligible for state financial aid. *Third*, the Illinois DREAM Fund scholarship is available to certain children of immigrants who attended an Illinois high school. Undocumented students are eligible for benefits under all these laws if they satisfy the statutory requirements.

**In-state tuition.** Illinois community colleges and universities are not required to establish a separate tuition rate for students who are state residents. But schools that choose to do so must offer the "in state" rate to other categories of students too. *E.g.*, 110 ILCS 305/7e-5 (University of Illinois); 110 ILCS 520/8d-5 (Southern Illinois University); 110 ILCS 660/5-88 (Chicago State University); 110 ILCS 665/10-88 (Eastern Illinois University); 110 ILCS 675/20-88 (Illinois State University); 110 ILCS 680/25-88 (Northeastern Illinois University); 110 ILCS 805/6-4a (community colleges).[2] For example, section 7e-5(a-5)(1) of the University of Illinois

---

[2] The federal government challenges only the laws listed above. ECF 1 at 2, ¶ 1. But other Illinois laws contain similar provisions. *See* 110 ILCS 670/15-88 (Governors State University); 110 ILCS 685/30-88 (Northern Illinois University); 110 ILCS 690/35-88 (Western Illinois University). The federal government explains that it does not challenge these other laws because the universities that are governed by them charge tuition at the same rate to all students, regardless of whether they are Illinois residents. ECF 1 at 2, ¶ 1 n.1. In other words, the laws currently do not have any application at these universities because the condition precedent (establishing a separate tuition rate for Illinois residents) has not occurred.

Act provides that, beginning in July 2026 (and with exceptions not relevant here), a student

"shall be charged tuition . . . at the same rate as an Illinois resident if" she:

> (A)    attended a public or private high school in this State for at least 2 years
>         before enrolling at the University;

> (B)    graduated from a public or private high school in this State or received the
>         equivalent of a high school diploma in this State;

> (C)    attended high school while residing in this State and has not established
>         residency outside of this State before enrolling at the University; and

> (D)    agrees to swear and affirm to the University that [she] will file an
>         application to become a permanent resident of the United States at the
>         earliest opportunity if [she] is eligible to do so and is not a citizen or
>         lawful permanent resident of the United States.

110 ILCS 305/7e-5(a-5)(1); *see id.* 7e-5(a-5)(2) (enumerating alternative but similar criteria

under which a student is eligible to be charged tuition at the same rate as an Illinois resident).[3]

**State financial aid.** Illinois offers financial aid and other benefits to students pursuing

higher education, including generous grants under the Monetary Award Program. *See* 110 ILCS

947/35; ECF 1 at 18, ¶ 61 (program "awards over $400 million in grants to approximately

145,000 undergraduates" every year to "cover tuition and mandatory fees"). A student is "eligible

for State financial aid and benefits," 110 ILCS 986/15(a), if she "is deemed an Illinois resident

for tuition purposes," *id.* 10. In other words, a student who is eligible for in-state tuition under

any of the laws cited above is also eligible for state financial aid and benefits. A student who is

---

[3] The challenged laws that are applicable to universities all contain identical provisions that also become
effective in July 2026. *See* 110 ILCS 520/8d-5(a-5)(1) & (2) (Southern Illinois University); 110 ILCS
660/5-88(a-5)(1) & (2) (Chicago State University); 110 ILCS 665/10-88(a-5)(1) & (2) (Eastern Illinois
University); 110 ILCS 675/20-88(a-5)(1) & (2) (Illinois State University); 110 ILCS 680/25-88(a-5)(1) &
(2) (Northeastern Illinois University). In addition, these laws contain materially identical provisions that
are currently in effect. *See* 110 ILCS 305/7e-5(a) (University of Illinois); 110 ILCS 520/8d-5(a) (Southern
Illinois University); 110 ILCS 660/5-88(a) (Chicago State University); 110 ILCS 665/10-88(a) (Eastern
Illinois University); 110 ILCS 675/20-88(a) (Illinois State University); 110 ILCS 680/25-88(a)
(Northeastern Illinois University). The challenged law that is applicable to community colleges likewise
contains a materially identical provision. *See* 110 ILCS 805/6-4a(a).

eligible for state financial aid and benefits under this provision may, among other things, "apply or receive consideration for any student aid or benefit funded or administered by the State, any State agency, or any public institution of higher learning." *Id.* 15(b)(i).

**Illinois DREAM Fund scholarship.** Illinois has also created several scholarships for students pursuing higher education. One of them is the Illinois DREAM Fund scholarship, which may be awarded to students who:

(1)    Have resided with [their] parents or guardian while attending a public or private high school in this State[;]

(2)    Have graduated from a public or private high school or received the equivalent of a high school diploma in this State[;]

(3)    Have attended school in this State for at least 3 years as of the date [they] graduated from high school or received the equivalent of a high school diploma[; and]

(4)    Have at least one parent who immigrated to the United States.

110 ILCS 947/67(c). The Illinois DREAM Fund scholarship is administered by an independent commission, *id.* 67(a) & (b)(1), and may be "funded . . . from private contributions, gifts, grants, awards, and proceeds from [an Illinois Lottery] scratch-off" game, *id.* 67(d).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." "Although for the purposes of [a] motion to dismiss [the Court] must take all the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). When "a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate." *Neitzke v. Williams*, 490 U.S. 319, 320 (1989); *see United States v. Illinois*, No. 25

C 4811, 2025 WL 2401304 (N.D. Ill. Aug. 19, 2025) ("*Illinois II*") (granting Rule 12(b)(6)

motion to dismiss claims that federal law preempts state law); *United States v. Illinois*, No. 25 C

1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) ("*Illinois I*") (same).

## ARGUMENT

The federal government's three claims are all premised on the assertion that 8 U.S.C.

§ 1623(a) expressly preempts state law: Count I contends that section 1623(a) preempts state

laws like 110 ILCS 305/7e-5(a-5) to the extent they make undocumented students eligible for in-

state tuition at Illinois community colleges and universities. ECF 1 at 22-23, ¶¶ 79-81. Count II

contends that section 1623(a) preempts 110 ILCS 986/10 to the extent it makes undocumented

students eligible for state financial aid and benefits. ECF 1 at 23, ¶¶ 82-84. Count III contends

that section 1623(a) preempts 110 ILCS 947/67(c) to the extent it makes undocumented students

eligible for the Illinois DREAM Fund scholarship. ECF 1 at 23-24, ¶¶ 85-87.

The problem for the federal government is that section 1623(a) violates the

anticommandeering doctrine and therefore is not a valid preemption provision under Supreme

Court precedent. The anticommandeering doctrine recognizes that Congress has no power to

issue orders directly to the states. And because only a validly enacted statute may have

preemptive effect under the Constitution's supremacy clause, a federal law that violates the

anticommandeering doctrine does not preempt state law.

Section 1623(a) runs afoul of the anticommandeering doctrine because it regulates states

rather than private actors. The statute provides that certain "alien[s]" "shall not be eligible" for

"postsecondary education benefit[s]" "on the basis of residence within a State."  And it is the

***states*** that enact the requirements that students must satisfy to "be eligible" for those

"postsecondary education benefit[s]"—the "alien[s]" themselves have no say in defining who is

6

eligible or what those qualifications may be. On the other hand, section 1623(a) does not impose restrictions or confer rights on private actors—it does not, for example, bar "alien[s]" from accepting "benefit[s]" or require that American citizens must receive "benefit[s]." It follows that section 1623(a) operates as a direct order to state legislatures forbidding them to enact laws that make certain "alien[s]" "eligible" for certain "benefits." The statute is therefore an affront to state sovereignty that finds no sanction in our Constitution.

The federal government cannot prevail on any of its claims against any of the state officials and entities it has sued unless section 1623(a) is a valid preemption provision. But section 1623(a) is not a valid preemption provision because it violates the anticommandeering doctrine. So all the federal government's claims against all defendants must be dismissed.

## I.  The anticommandeering doctrine recognizes that Congress has no power to issue orders directly to the states.

The anticommandeering doctrine "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 584 U.S. at 470. In other words, the Constitution confers on Congress "only certain enumerated powers"; "all other legislative power is reserved for the States, as the Tenth Amendment confirms." *Id.* at 471. "And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.*

The omission was no oversight. To the contrary, "the question whether the Constitution should permit Congress to employ state governments as regulatory agencies was a topic of lively debate among the Framers." *New York v. United States*, 505 U.S. 144, 163 (1992). But "[t]he Framers' experience under the Articles of Confederation [ ] persuaded them that using the States as the instruments of federal governance was both ineffectual and provocative of federal-state

conflict." *Printz v. United States*, 521 U.S. 898, 919 (1997). So instead they "opted for a
Constitution in which Congress would exercise its legislative authority directly over individuals
rather than over States." *New York*, 505 U.S. at 165. And the Supreme "Court has consistently
respected this choice" by holding, for example, "that even where Congress has the authority
under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power
directly to compel the States to require or prohibit those acts." *Id.* at 166.

This "simple and basic" principle—that the Constitution confers on Congress the power
to regulate individuals and not states—is fundamental to our federal form of government.
*Murphy*, 584 U.S. at 471. "It is incontestible that the Constitution established a system of 'dual
sovereignty'" under which the states "retained 'a residuary and inviolable sovereignty'"
encompassing, at least, all "powers" not "surrendered" "to the new Federal Government." *Printz*,
521 U.S. at 918-19. And in "reject[ing] the concept of a central government that would act upon
and through the States," the Constitution "contemplates that a State's government will represent
and remain accountable to its own citizens." *Id.* at 919-20. "This separation of the two
spheres"—state and federal, each of them sovereign—"is one of the Constitution's structural
protections of liberty." *Id.* at 921; *see id.* at 920 ("great innovation of this design was that 'our
citizens would have two political capacities . . . each protected from incursion by the other'").

Understanding this constitutional design helps to "explain[ ] why adherence to the
anticommandeering principle is" so "important." *Murphy*, 584 U.S. at 473. For starters, "[t]he
Constitution does not protect the sovereignty of States for the benefit of the States or state
governments as abstract political entities" but rather "divides authority between federal and state
governments for the protection of individuals." *New York*, 505 U.S. at 181. In other words, "'a
healthy balance of power between the States and the Federal Government will reduce the risk of

tyranny and abuse from either front.'" *Id.*; *see United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019) (anticommandeering doctrine "permits a state's refusal to adopt preferred federal policies"). And the very point of the anticommandeering doctrine is that it may sometimes protect individual liberty at the cost of government efficiency: the Constitution "divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *New York*, 505 U.S. at 187; *see Illinois I*, 2025 WL 2098688, at *8 (Congress "may not wield States as federal tools" "no matter how strong the federal interest at play").

There is more: "the anticommandeering rule [also] promotes political accountability." *Murphy*, 584 U.S. at 473. When the federal government "'dragoon[s]'" state officials "into administering federal law" by making them "'puppets of a ventriloquist Congress,'" state officials are "put in the position of taking the blame for" the federal law's "burdensomeness and for its defects." *Printz*, 521 U.S. at 928, 930. Meanwhile, "the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *New York*, 505 U.S. at 169. "When Congress itself regulates," by contrast, "the responsibility for the benefits and burdens of the regulation is apparent. Voters who like or dislike the effects of the regulation know who to credit or blame." *Murphy*, 584 U.S. at 473; *see Chicago v. Sessions*, 321 F. Supp. 3d 855, 870 (N.D. Ill. 2018) (holding that 8 U.S.C. § 1373 violates anticommandeering doctrine because it "makes it difficult for citizens to distinguish between state and federal policy in the immigration context by barring states from adopting [contrary] policies").

Likewise, "the anticommandeering principle prevents Congress from shifting the [ ] costs of regulation to the States." *Murphy*, 584 U.S. at 474. When "Congress enacts a law and requires enforcement by the Executive Branch, it must appropriate the funds needed to administer the

program" and "weigh the expected benefits of the program against its costs." *Id.* "But if
Congress can compel the States to enact and enforce its program, Congress need not engage in
any such analysis." *Id.* And "[b]y forcing state governments to absorb the financial burden of
implementing a federal regulatory program, [ ] Congress can take credit for 'solving' problems
without having to ask their constituents to pay for the solutions." *Printz*, 521 U.S. at 930.

## II.    A federal law that violates the anticommandeering doctrine by issuing orders directly to the states does not preempt state law.

Why spill so much ink on the anticommandeering doctrine, one might ask, when the
federal government's claims in this litigation are based on a different doctrine—namely, that the
challenged state laws are preempted under federal law? The reason is because "these two
doctrines—preemption and anticommandeering—represent opposite sides of the same coin."
*Brackeen v. Haaland*, 994 F.3d 249, 298 (5th Cir. 2021), *affirmed, vacated, and reversed in part*,
599 U.S. 255 (2023). Preemption derives from the Constitution's supremacy clause, which "is
not the source of any federal rights" but rather "creates a rule of decision: Courts 'shall' regard
the 'Constitution,' and all laws '***made in Pursuance thereof***,' as 'the supreme Law of the
Land.'" *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015) (cleaned up and
emphasis added). In other words, preemption comes into play only if Congress has enacted "a
***valid*** statute." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (emphasis added).

The Supreme Court in *Murphy* carefully examined the relationship between preemption
and anticommandeering. It concluded that a federal law "must satisfy two requirements" to be a
valid statute that "preempt[s] state law." 584 U.S. at 477. At the very least, the federal law "must
represent the exercise of a power conferred on Congress by the Constitution." *Id.* But that alone
is insufficient: the federal law "must" also "regulate[ ] private actors" rather than states. *Id.* This
additional requirement, of course, flows from the "simple and basic" principle animating the

10

anticommandeering doctrine: that "the Constitution 'confers upon Congress the power to regulate individuals, not States.'" *Id.* at 471, 477 (quoting *New York*, 505 U.S. at 166). And it finds further support in the "way" that "all" preemption theories traditionally have "work[ed]": "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* at 477; *see id.* at 479 ("regardless of the language sometimes used by Congress and [the Supreme] Court, every form of preemption is based on a federal law that regulates the conduct of private actors, not the States").

It's worth emphasizing two features of *Murphy*'s preemption requirements. *First*, the requirement that the purportedly preemptive federal law must regulate private actors (rather than states) is independent of the requirement that it must regulate a subject within Congress's enumerated powers. In other words, even when Congress has "legislative authority over the subject matter" of a federal law—like immigration—the law is valid (and has preemptive effect) only if it also comports with "the principles of federalism" reflected in the anticommandeering doctrine. *Reno v. Condon*, 528 U.S. 141, 149 (2000); *see New York*, 505 U.S. at 166 ("even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.").

As the Seventh Circuit put it: "The [Supreme] Court said at least three times in *Murphy* that a valid preemption provision is one that regulates private actors," and "courts have relied on *Murphy* to reject preemption claims where the federal immigration statutes at issue did not regulate private actors." *McHenry County v. Raoul*, 44 F.4th 581, 588 (7th Cir. 2022) (citing *Ocean County Board of Commissioners v. Attorney General*, 8 F.4th 176, 181-82 (3d Cir. 2021)). To argue for an exception to this "private actors" requirement when Congress legislates under its

11

enumerated powers is to insist that "*Murphy* did not really mean what it said about preemption." *Id.* And that is never "'a good rule of thumb for reading [the Supreme Court's] decisions.'" *Id.*

*Second*, "it is a mistake to be confused by the way in which a preemption provision is phrased." *Murphy*, 584 U.S. at 478. This is because the words that Congress "employ[s] in" a federal law's "preemption provision" are not dispositive of whether the provision regulates private actors (and thus has preemptive effect) or whether the provision regulates states (and thus has no effect at all). *Id.* What matters instead is how the "provision operates." *Id.* A federal law has preemptive effect only if, considering how it works in practice, the law is "***best read*** as one that regulates private actors" rather than states. *Id.* at 477 (emphasis added).

## III.    Section 1623(a) violates the anticommandeering doctrine and therefore does not preempt the challenged state laws.

### A.    Section 1623(a) regulates states rather than private actors.

"Once [these principles are] understood, it is clear that" 8 U.S.C. § 1623(a) "is not a preemption provision because there is no way in which this provision can be understood as a regulation of private actors." *Murphy*, 584 U.S. at 479-80. To the contrary, section 1623(a) violates the anticommandeering doctrine because it "unequivocally dictates what a state legislature may and may not do." *Id.* at 474. "It is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals. A more direct affront to state sovereignty is not easy to imagine." *Id.*

Start with the text to understand why section 1623(a) falls on the wrong side of the divide between the preemption and anticommandeering doctrines. The statute provides that "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless" certain conditions are satisfied. There is no question that section 1623(a) "represent[s] the exercise of a

12

power conferred on Congress by the Constitution" and therefore satisfies *Murphy*'s first

requirement to be a valid statute that "preempt[s] state law." 584 U.S. at 477. After all, the

"Constitution provides the federal government with 'broad, undoubted power over the subject of

immigration and the status of aliens.'" *Illinois II*, 2025 WL 2401304, at *1 (quoting *Arizona v.

United States*, 567 U.S. 387, 394 (2012), and citing U.S. Const. art. I, § 8, cl. 4).

But remember: a federal law is not a valid preemption provision simply because

Congress has "legislative authority over [its] subject matter." *Reno*, 528 U.S. at 149. "[E]ven

where Congress has the authority under the Constitution to pass laws requiring or prohibiting

certain acts, it lacks the power directly to compel the States to require or prohibit those acts."

*New York*, 505 U.S. at 166. And, as the Seventh Circuit explains, "courts have relied on *Murphy*

to reject preemption claims"—even preemption claims based on "federal immigration

statutes"—because those statutes "did not regulate private actors." *McHenry County*, 44 F.4th at

588 (citing *Ocean County*, 8 F.4th at 181-82). So turn next to *Murphy*'s second preemption

requirement and ask: Does section 1623(a) "regulate[ ] private actors," which would make it "a

valid preemption provision"? 584 U.S. at 477. Or, on the other hand, does section 1623(a)

regulate states, which would make it "not a preemption provision" at all? *Id.* at 477, 479.

A close reading of section 1623(a)'s plain language establishes that the statute regulates

states rather than private actors. That means it is not a valid preemption provision because it runs

afoul of the anticommandeering doctrine. To be sure, section 1623(a) does not expressly address

the states as regulated entities; instead, it refers to "alien[s] who [are] not lawfully present in the

United States." But, as the Supreme Court cautions, "it is a mistake to be confused by the way"

that section 1623(a) "is phrased" because appearances can be deceiving when it comes to

assessing the preemptive effect of a federal law. *Murphy*, 584 U.S. at 478. And in light of how

13

section 1623(a) "operates" in practice, the only available conclusion is that the statute is "best read as one that regulates" states rather than "aliens." *Id.* at 477-78.

The key word in section 1623(a) is "eligible." It defines the specific action that the statute forbids: causing "an alien who is not lawfully present in the United States" to "***be eligible***" for a "postsecondary education benefit." And "eligible" means: "Fit and proper to be selected or to receive a benefit; legally qualified for an office, privilege, or status." *Black's Law Dictionary*; *see, e.g.*, *FCC v. Consumers' Research*, 606 U.S. 656, 681 (2025) (consulting *Black's Law Dictionary* to determine the meaning of an undefined statutory term).

Who determines whether "an alien who is not lawfully present in the United States" is qualified for a "postsecondary education benefit" under the challenged state laws? It is not the "alien"; she did not decide that, under 110 ILCS 305/7e-5(a-5)(1)(A), for example, a student who wishes to pay in-state tuition at the University of Illinois must have "attended a public or private high school in this State for at least 2 years before enrolling." Rather, those qualifications were enacted by the Illinois legislature. In other words, it is the ***state*** that determines whether the "alien" is "eligible" for a "postsecondary education benefit" by establishing the requirements that the "alien" must satisfy to receive the "benefit." And it is ***only*** the states that make students "eligible" for "benefit[s]" within the meaning of section 1623(a): private universities don't offer in-state tuition or other "benefit[s]" "on the basis of residence within a State."[4]

So, when section 1623(a) says that "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for

---

[4] *E.g.*, Northwestern University, "Tuition and Fees," admissions.northwestern.edu/tuition-aid/#tuition; University of Chicago, "Undergraduate Costs," financialaid.uchicago.edu/undergraduate/how-aid-works/undergraduate-costs/; *see Haaland v. Brackeen*, 599 U.S. 255, 282 (2023) (examining real world applications to determine whether statute is "'best read' as a command to the States").

any postsecondary education benefit," that is a restriction on what the ***state*** can do. The statute therefore functions as a direct order to state legislatures—forbidding them to make certain "alien[s]" "eligible" for "postsecondary education benefit[s]" under certain circumstances. "And that is exactly what the anticommandeering rule does not allow." *Murphy*, 584 U.S. at 480.

This conclusion is confirmed by considering what section 1623(a) does ***not*** do. It does not "impose any federal restrictions on private actors" by, for example, forbidding "an alien who is not lawfully present in the United States" from ***accepting*** certain "benefit[s]." *Murphy*, 584 U.S. at 480. And it does "not confer any federal rights on private actors" by, for example, ***requiring*** that American citizens must receive the same "benefit[s]" as "alien[s]." *Id.*; *see Young Conservatives of Texas Foundation v. Smatresk*, 73 F.4th 304, 313 (5th Cir. 2023) ("§ 1623(a) doesn't impose any duty to grant the same benefits to U.S. citizens"); *Day v. Bond*, 500 F.3d 1127, 1139 (10th Cir. 2007) ("§ 1623 addresses itself to the institutions affected and their authority to provide benefits to illegal aliens, not to the class of nonresident citizens who incidentally benefit from its provisions"). A statute does not regulate private actors if it neither imposes restrictions on them nor confers rights on them. *Murphy*, 584 U.S. at 480. And since section 1623(a) does not regulate private actors, "there is simply no way to understand" the statute "as anything other than a direct command to the States." *Id.*[5]

---

[5] Another way to see this is to imagine alternative versions of section 1623(a) that ***do*** regulate private actors. If Congress had wanted to impose restrictions on "alien[s]," it could have said: "an alien who is not lawfully present in the United States ***shall not accept*** any postsecondary education benefit." And if Congress had wanted to confer rights on American citizens, it could have said: "a citizen of the United States ***shall receive*** any postsecondary education benefit available to an alien who is not lawfully present in the United States on the basis of residence within a State." But Congress did not enact either of these alternatives. *See Hulce v. Zipongo Inc.*, 132 F.4th 493, 498-99 (7th Cir. 2025) (considering "alternative phrasings available to Congress" as evidence that Congress did not intend those meanings).

**B.    Even if section 1623(a) regulates private actors, it still violates the anticommandeering doctrine because it also issues a direct order to states.**

Suppose, however, that this is wrong—and that section 1623(a) *is* regulating private actors when it says that "an alien who is not lawfully present in the United States shall not be eligible" for certain "postsecondary education benefit[s]." Even so, the statute still violates the anticommandeering doctrine because it also issues a direct order to the states instructing them on what they must do if they wish to regulate those same private actors. Just as Congress "may not direct the states to *use* their legislative powers to regulate private conduct," *Travis v. Reno*, 163 F.3d 1000, 1003 (7th Cir. 1998) (emphasis added), so too Congress may not direct the states on *how* to use their legislative powers *if they choose* to regulate private conduct, *see New York*, 505 U.S. at 162 ("the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions").

The crucial point is that section 1623(a) does not impose a blanket prohibition on eligibility for any "postsecondary education benefit." Instead, the statute provides that certain "alien[s]" "shall not be eligible" for those "benefit[s] *unless*" a state satisfies conditions imposed by the federal government—namely, that the state makes those same "benefit[s]" available to "a citizen or national of the United States . . . without regard to whether the citizen or national is . . . a [state] resident." In other words, section 1623(a) is a default rule that states can overcome if, but only if, they regulate private actors in the precise manner required by the federal government: "if you do *x*, you must also do *y*." This is a direct order to the states that is forbidden by the anticommandeering principle. *See also* 8 U.S.C. § 1621(d) ("A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.").

16

**C.    Applying the anticommandeering doctrine to section 1623(a) promotes our nation's commitments to individual liberty and political accountability.**

The anticommandeering doctrine is not a mere formality; to the contrary, it is an essential "structural" component of our nation's longstanding commitments to individual "liberty" and political accountability. *Printz*, 521 U.S. at 921. And section 1623(a) helps to illustrate why. States like Illinois stand as a bulwark against the federal government's increasingly cruel and unjustified approach to undocumented students, who typically are "'productive young people' who were brought here as children and 'know only this country as home.'" *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 29 (2020). It is precisely "for the protection of individuals" like these students that our Constitution "divides authority between federal and state governments," *New York*, 505 U.S. at 181, and "permits" the states to "refus[e] to adopt preferred federal policies," *California*, 921 F.3d at 889.

The people of Illinois have spoken through their representatives in the state legislature: they believe that undocumented students who have strong ties to this state should enjoy access to the same educational benefits as their friends and neighbors who are American citizens. The federal government may not instruct Illinois to reverse course: it may not "'dragoon[ ]'" state officials "into administering federal law" by making them "'puppets of a ventriloquist Congress.'" *Printz*, 521 U.S. at 928; *see Murphy*, 584 U.S. at 473-74 ("responsibility is blurred" when a state acts "only because it has been commanded to do so by Congress"). If the federal government insists on depriving undocumented students of opportunities to receive a college education—if it insists on creating "a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents," *Plyler*, 457 U.S. at 218-19—then it must undertake the effort in its own name. *See Illinois I*, 2025 WL 2098688, at

17

*24 ("key harm the anticommandeering doctrine is intended to prevent" is "that the federal government could shift the 'credit or blame' associated with its civil immigration enforcement agenda onto Illinois"). Because section 1623(a) does not comply with these basic principles of our constitutional order, it does not preempt the challenged Illinois laws that provide higher education benefits to undocumented students. And because section 1623(a) is not a valid preemption provision, all the federal government's claims against all defendants must be dismissed.

## CONCLUSION

Section 1623(a) violates the anticommandeering doctrine and therefore does not preempt the challenged state laws. The Court should dismiss all the federal government's claims against all defendants under Rule 12(b)(6).


Dated: November 14, 2025                    Respectfully submitted,

                                             /s/ Darren Kinkead
                                            Darren Kinkead
                                            Aleeza Strubel
                                            Office of the Illinois Attorney General
                                            115 South LaSalle Street
                                            Chicago, IL 60603
                                            (773) 590-6967
                                            Darren.Kinkead@ilag.gov