IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | No. 3:25-cv-1691-DWD |
| v. | |
| STATE OF ILLINOIS, *et al*. | |
| *Defendants*. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND**
**<u>CROSS-MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS</u>**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

STATEMENT OF MATERIAL FACTS.............................................................................3

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENT ...................................................................................................................... 11

I.    The United States is Entitled to Summary Judgment Because the Challenged Illinois
      Laws are Preempted by Section 1623 ...................................................................... 11

      A.    Applicable Law...................................................................................................... 11

      B.    Section 1623 Preempts the Challenged Laws....................................................... 12

            1.    The 2003 Act and 2024 Act are Expressly Preempted. ............................ 13

            2.    The Illinois Rise Act Is Preempted. ......................................................... 16

            3.    The Illinois Dream Act Is Preempted. ...................................................... 17

II.   The Anticommandeering Doctrine Does Not Nullify the Supremacy Clause .................. 18

      A.    The Federal Government Has Broad and Undoubted Power over
            Immigration and The Status of Aliens................................................................... 18

      B.    The Anticommandeering Doctrine Merely Prohibits the Federal Government
            From Usurping State Sovereignty.......................................................................... 21

III.  Section 1623 of the Immigration and Nationality Act Is a Constitutional Exercise of
      Congress's Enumerated Immigration Powers.................................................................. 25

      A.    Section 1623 Regulates Aliens not States............................................................. 26

      B.    Section 1623 Applies to Anyone Who Makes Aliens Eligible for Postsecondary
            Education Benefits on the Basis of Residence....................................................... 28

      C.    Illinois' Contrary Policy Preferences Cannot Change That Section 1623 is the
            Supreme Law of the United States......................................................................... 31

IV.   The United States is Entitled to An Injunction ............................................................... 33

      A.    Injunction Factors ................................................................................................. 33

      B.    Injunction Scope ................................................................................................... 36

i

CONCLUSION................................................................................................................37

# TABLE OF AUTHORITIES

## CASE LAW

*Albernaz v. United States*,
450 U.S. 333 (1981) ................................................................................................ 31

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ............................................................................... 34

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) ................................................................................. 10

*Arizona v. United States*,
567 U.S. 387 (2012) ......................................................................................... *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................... 10, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................ 10

*Blackie's House of Beef, Inc. v. Castillo*,
659 F.2d. 1211 (D.C. Cir. 1981) ...................................................................... 35, 37

*Chambers v. Osteonics Corp.*,
109 F.3d 1243 (7th Cir. 1997) ............................................................................... 11

*CoreCivic, Inc. v. Murphy*,
690 F. Supp. 3d 467 (D.N.J. 2023) ........................................................................ 28

*City of N.Y. v. United States*,
179 F.3d 29 (2d Cir. 1999) ....................................................................... 27, 29, 35

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993) ................................................................................................ 11

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ................................................................................................ 33

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*,
485 U.S. 568 (1988) ................................................................................................ 30

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) .................................................................................................. 11

*Equal Access Educ. v. Merten*,
305 F. Supp. 2d 585 (E.D. Va. 2004) .............................................................. 12, 29

*F.C. Bloxom Co. v. Tom Lange Co. Int'l, Inc.*,
   109 F.4th 925 (7th Cir. 2024) ................................................................ 10

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ............................................................................ 19

*Fifth Third Bank ex rel. Tr. Officer v. CSX Corp.*,
   415 F.3d 741 (7th Cir. 2005) ........................................................... 11, 12

*Gibson v. City of Chicago*,
   910 F.2d 1510 (7th Cir. 1990) ......................................................... 10, 11

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ................................................................. 28, 30, 31

*Herrlein v. Kanakis,*
   526 F.2d 252 (7th Cir. 1975) ................................................................ 36

*Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*,
   452 U.S. 264 (1981) ........................................................ 22, 23, 24, 30

*Joren v. Napolitano*,
   633 F.3d 1144 (7th Cir. 2010) .............................................................. 12

*Korte v. Sebelius*,
   735 F.3d 654 (7th Cir. 2013) ................................................................ 33

*Life Spine, Inc. v. Aegis Spine, Inc.*,
   8 F.4th 531 (7th Cir. 2021) .................................................................. 33

*McHenry County v. Raoul*,
   44 F.4th 581 (7th Cir. 2022) ................................................................ 27

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ...................................................................... 21, 29

*Murphy v. NCAA*,
   584 U.S. 453 (2018) ................................................................... *passim*

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
   491 U.S. 350 (1989) ...................................................................... 33, 34

*New York v. United States Dep't of Justice*,
   951 F.3d 84 (2d Cir. 2020) ............................................................. 26, 27

*New York v. United States*,
   505 U.S. 144 (1992) .......................................................... 22, 23, 30, 31

iv

*Nken v. Holder,*
   556 U.S. 418 (2009)................................................................................................ 33

*Ocean County Board of Commissioners v. Attorney General,*
   8 F.4th 176 (3d Cir. 2021)..................................................................................... 27

*Oceanic Navigation Co.* v. *Stranahan,*
   214 U.S. 320 (1909)................................................................................................ 19

*Odebrecht Constr. v. Sec'y, Fla. DOT,*
   715 F.3d 1268 (11th Cir. 2013)............................................................................. 35

*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n,*
   461 U.S. 190 (1983)................................................................................................ 11

*Plyler v. Doe,*
   457 U.S. 202 (1982)................................................................................................ 19

*Printz v. United States,*
   521 U.S. 898 (1997)................................................................................................ 23

*Puerto Rico v. Sanchez-Valle,*
   579 U.S. 59 (2016).................................................................................................. 12

*Shaughnessy* v. *Mezei,*
   345 U.S. 206 (1953)................................................................................................ 19

*South Carolina v. Baker,*
   485 U.S. 505 (1988)................................................................................. 22, 29, 32

*Toll* v. *Moreno,*
   458 U.S. 1 (1982).................................................................................................... 1

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012)............................................................................. 35

*United States v. Arizona,*
   641 F.3d 339 (9th Cir. 2011)................................................................................. 34

*United States v. Oklahoma,*
   2025 U.S. Dist. LEXIS 168579 (E.D. Oklah. Aug. 29, 2025)........................... 16, 20

*United States v. Texas,*
   350 F.R.D. 74 (N.D. Tex. 2025)................................................................ 12, 15, 17, 20

*Weaver v. Speedway, LLC,*
   28 F.4th 816 (7th Cir. 2022).................................................................................. 10

*Young Conservatives of Texas Foundation v. Smatresk,*
    73 F.4th 312 (5th Cir. 2023) .................................................................. 12, 20

## FEDERAL STATUTES

8 U.S.C. § 1373 .................................................................. 26, 27, 29

8 U.S.C. § 1601 .................................................................. 34

8 U.S.C. § 1601(2) .................................................................. 20

8 U.S.C. § 1601(6) .................................................................. 20

8 U.S.C. § 1621(d) .................................................................. 7

8 U.S.C. § 1623 .................................................................. *passim*

## STATE STATUTES

20 ILCS § 1605/21.16 .................................................................. 9
110 ILCS § 305/7e-5 .................................................................. 13, 14, 15
110 ILCS § 305/7e-5(a)(5) .................................................................. 4, 5, 14
110 ILCS § 305/7e-5(a)(a-5) .................................................................. 7, 14
110 ILCS § 947/15 .................................................................. 4, 5
110 ILCS § 947/20 .................................................................. 4,
110 ILCS § 947/67 .................................................................. 4, 8
110 ILCS § 947/67(c) .................................................................. 8, 9, 18
110 ILCS § 986 .................................................................. 7
110 ILCS § 986/10 .................................................................. 7, 16
110 ILCS § 986/5(1) .................................................................. 17
110 ILCS § 986/15(a) .................................................................. 7
110 ILCS § 986/15(b) .................................................................. 7
110 ILCS § 986/15(d) .................................................................. 7
110 ILCS § 520/8d-5 .................................................................. 13, 15
110 ILCS § 520/8d-5(a)(5) .................................................................. 4, 5
110 ILCS § 520/8d-5(a-5) .................................................................. 7, 14
110 ILCS § 660/5-88 .................................................................. 13, 15
110 ILCS § 660/5-88(a)(5) .................................................................. 4, 5
110 ILCS § 660/5-88(a-5) .................................................................. 7, 14
110 ILCS § 665-10/88 .................................................................. 13, 15
110 ILCS § 665-10/88(a)(5) .................................................................. 4, 5
110 ILCS § 665-10/88(a-5) .................................................................. 7, 14
110 ILCS § 675/20-88 .................................................................. 13, 15
110 ILCS § 675/20-88(a)(5) .................................................................. 4, 5
110 ILCS § 675/20-88(a-5) .................................................................. 7, 14

110 ILCS § 680/25-88 ............................................................................................ 13, 15
110 ILCS § 680/25-88(a)(5) ...................................................................................... 4, 5
110 ILCS § 680/25-88(a-5) ....................................................................................... 7, 14
110 ILCS § 805/6-4a .............................................................................................. 13, 15
110 ILCS § 805/6-4a(a)(5) ........................................................................................ 4, 5

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 1 ..................................................................................................... 10
Fed. R. Civ. P. 12(b)(6) ............................................................................................ 10
Fed. R. Civ. P. 56(a) ............................................................................................... 10
Fed. R. Civ. P. 65(d)(2) ............................................................................................ 36

## PUBLIC LAW

Pub. L. No. 99–603 ................................................................................................. 34
Pub. L. No. 104-208 ............................................................................................... 3, 20
Pub. L. No. 104-193 ................................................................................................ 19

## MISCELLANEOUS

Community Foundation of Northern Illinois, *Scholarships* available at
    https://www.cfnil.org/scholarships. (last visited Jan 16, 2026) ......................................... 10, 28

DREAM Fund, *DREAM Fund scholarships* available at http://www.ildreamfund.org/ (last visited
    Jan 16, 2026) ................................................................................................. 8, 9

Higher Ed Immigration Portal, *Illinois* available at
https://www.higheredimmigrationportal.org/state/illinois/ (last visited Jan 16, 2026) .................. 8

Illinois Student Assistance Commision, *Monetary Award Program (MAP)* available at
    https://www.isac.org/students/during-college/types-of-financial-aid/grants/monetary-award-
    program// (last visited Jan 16, 2026) ........................................................................ 9

## INTRODUCTION

In 1996, Congress decided that if illegal aliens are eligible for post-secondary education tuition benefits based on residency within a state, then United States citizens cannot be denied eligibility for those same benefits just because they don't live within that state. Congress's logic is clear: discrimination against United States citizens in favor of illegal aliens is not just unwise, it's wrong. Despite Congress's clear prohibition, the State of Illinois passed legislation that discriminates against United States citizens in favor of illegal aliens by making such aliens eligible for resident tuition, financial aid, and scholarships that are not available to United States citizens simply because they live in another state. That legislation is plainly preempted by federal law. Illinois does not even dispute that its laws conflict with Section 1623. Their desperate attempt to avoid preemption by appealing to anti-commandeering principles fails. Every valid exercise of federal preemption necessarily constrains state legislative freedom; that is the very definition of preemption under the Supremacy Clause. When Congress, acting within an enumerated or plenary power, enacts a law that occupies a field or directly conflicts with state law, the inevitable and intended result is that states may no longer legislate in the manner they otherwise could have. The Supreme Court has never treated this ordinary consequence as "commandeering." To the contrary, it has repeatedly upheld federal statutes that left states with no choice but to alter or abandon their own legislative schemes.

The Federal Government of the United States has "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012) (citing *Toll* v. *Moreno*, 458 U.S. 1 (1982)). Such authority derives from the Constitution and the United States' "inherent power as sovereign to control and conduct relations with foreign nations." *Id.* at 394-95. The State of Illinois, however, decided to "stand as a bulwark against the federal

government's … approach to undocumented students" and, through its own laws, provide access to postsecondary education benefits on terms contrary to federal law.

There is no doubt that the challenged Illinois laws—the Acevedo Bill, the RISE Act and the DREAM Act—are directly contrary to federal law. Section 1623 of the Immigration and Nationality Act ("INA") is clear that an alien not lawfully present in the United States "shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623. In other words, if Illinois wishes to provide access to postsecondary education benefits to aliens not lawfully present on the basis of their residence in the State of Illinois, such benefits cannot be denied to United States citizens because of residence. Illinois' laws flagrantly violate this provision. Each Illinois law uses residence in Illinois to create eligibility for postsecondary education benefits. And each of the challenged laws makes illegal aliens eligible for postsecondary education benefits based on residence. None of the challenged laws provides equal benefits to U.S. citizens or nationals of other states. By violating Section 1623, Illinois' laws run afoul of the Constitution, which has established federal law as the supreme law of the Nation.

The Defendants nonetheless try to save their laws and policies by asking this Court to declare Section 1623 an unconstitutional commandeering of the states under the Tenth Amendment. No court has ever reached that conclusion in thirty years since the law was passed. Neither should this one. The Defendants' Tenth Amendment claim is, at bottom, an attempt to obscure the meaning of a simple statutory provision and then persuade this Court to use tools of statutory interpretation to change the statute's meaning in its favor. But Section 1623 is a straightforward preemptive provision that regulates aliens. *Id.* ("an *alien* who is not lawfully

present in the United States shall not be eligible ….") (emphasis added). Under the Supreme Court's Tenth Amendment and Supremacy Clause jurisprudence, there is no constitutional defect with Section 1623.

The United States was built on principles of federalism, with certain powers granted to the federal government, like immigration, and other powers reserved to the states. The Defendants seek to undermine the basic principles of federalism by declaring control over immigration to be a state power because they disagree with federal immigration laws, policies, and priorities. But that is not how our country works and, regardless of the state legislature's intentions, is an assault on our constitutional order. The United States and its citizens are harmed by Illinois' flagrant constitutional violations, and it should be enjoined from continuing to prioritize benefits to illegal aliens over United States citizens.

## STATEMENT OF MATERIAL FACTS

1.  In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). *See* Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996).

2.  IIRIRA included what was codified as 8 U.S.C. § 1623 ("Section 1623").

3.  Section 1623 states: Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

4.  Governor of Illinois JB Pritzker has "the supreme executive power, and shall be responsible for the faithful execution of the laws." Illinois Constitution, Article V, Section 8.

5.  The Attorney General of Illinois Kwame Raoul is the state's chief legal officer.

6.    The Board of Trustees for each of Southern Illinois University, Rend Lake College, University of Illinois, Chicago State University, Eastern Illinois University, Illinois State University, and Northeastern Illinois University are charged with fixing rates for tuition for their respective institutions as well as determining Illinois residency for the purpose of charging in-state tuition or providing other educational benefits. *See* Compl ¶¶ 10-16.

7.    Illinois Student Assistance Commission ("ISAC") is a state entity created by state statute to assist Illinois students in realizing their postsecondary educational goals and administer programs for monetary assistance for students. 110 ILCS §§ 947/15, 20.

8.    The Illinois DREAM Fund Commission is a state entity charged with establishing a not-for-profit entity for fundraising, training, and awarding scholarships, raising funds for the DREAM Fund, and selecting recipients of scholarships funded by the DREAM Fund. 110 ILCS § 947/67.

9.    Illinois Public Act 093-0007 ("2003 Act"), sometimes referred to as the "Acevedo Bill" was signed into law on May 20, 2003, and provides eligible students with access to in-state tuition at the state's public colleges and universities.

10.    The 2003 Act includes 110 ILCS §§ 305/7e-5(a)(5) (University of Illinois), 520/8d-5(a)(5) (Southern Illinois University), 660/5-88(a)(5) (Chicago State University), 665-10/88(a)(5) (Eastern Illinois University), 675/20-88(a)(5) (Illinois State University), 680/25-88(a)(5) (Northeastern Illinois University), 805/6-4a(a)(5) (Public Community College Act).

11.    Under the 2003 Act, students who are not citizens or lawful permanent residents of the United States can establish Illinois residency for tuition purposes by meeting the residency requirements of the Act.

12.     Aliens not lawfully present in the United States can be eligible for in-state tuition at the State's public colleges and universities if they meet the requirements of the 2003 Act.

13.     To be eligible for in-state tuition under the 2003 Act, an alien not lawfully present must show, that (1) he resided with his parent or guardian while attending a public or private high school in Illinois for at least three years, (2) that he graduated from a high school in Illinois or received the equivalent of a high school diploma, (3) that he executed an affidavit stating that he will file an application to become a permanent resident of the United States at the earliest opportunity he is eligible to do so, and (4) that he has not established residence outside of Illinois. *See* 110 ILCS §§ 305/7e-5(a)(5), 520/8d-5(a)(5), 660/5-88(a)(5), 665-10/88(a)(5), 675/20-88(a)(5), 680/25-88(a)(5), 805/6-4a(a)(5).

14.     The Act is structured such that each section relates to a different state university within Illinois, but each section is otherwise identical, or virtually identical, in scope. Each challenged section contains language that includes residence in Illinois as a criterion to receive postsecondary education benefits under the Act. *See id.*

15.     Pursuant to the 2003 Act, an individual who is not lawfully present in the United States, who establishes Illinois residency by meeting statutory criteria, pays the same tuition rate as other Illinois residents. *See id.* There is no provision within the 2003 Act that affords the same benefit to U.S. citizens and nationals who are residents of other states. *See id.* Thus, under the 2003 Act, an individual who is a not lawful permanent resident can pay a lower tuition rate than a non-Illinois resident that is a U.S. citizen or a lawful permanent resident.

16.     The 2003 Act tuition provisions sunset on July 1, 2026, in favor of an even less-stringent 2024 amendment.

17.     The amendment, Illinois Public Act 103-0876 ("2024 Act"), signed into law on August 9, 2024, makes changes to current law and expands in-state tuition for illegal aliens. Effective July 1, 2026, the Illinois residency criteria for in-state tuition will change. Students—with the exception of individuals who have a non-immigrant status that "precludes an intent to permanently reside in the United States" under 8 U.S.C. § 1101(a)—will be eligible for in-state tuition if they meet one of the two sets of residency requirements as described in that Act.

18.     The First set of residence requirements requires two years of high school:

   a.   attended an Illinois high school for at least two years before enrolling at the university;

   b.   graduated from an Illinois high school or received the equivalent of a high school diploma in Illinois;

   c.   attended high school while residing in Illinois and did not establish residency outside of Illinois before enrolling at the university;

   d.   if the individual is not a citizen or lawful permanent resident of the United States, the individual swears and affirms to the university that the individual will file an application to become a permanent resident at the earliest opportunity if eligible to do so.

19.     The second set of residence requirements requires attendance a total of three years through a combination of high school and community college:

   a.   attended any of the following for at least two years and attended for a cumulative total of at least three years before enrolling at the university, a public or private high school in Illinois, a public community college, or a combination of high school and community college;

b.  and at the time of enrollment graduated from high school in Illinois or received the equivalent of a high school diploma in Illinois; and earned an associate degree from or completed at least 60 credit hours at a community college;

c.  has not established residency in another state before enrolling at the university; and

d.  if the individual is not a citizen or lawful permanent resident of the U.S., the individual swears and affirms to the university that the individual will file an application to become a permanent resident at the earliest opportunity if eligible to do so.

*See* 110 ILCS §§ 305/7e-5(a-5), 520/8d-5(a-5), 660/5-88(a-5), 665/10/88(a-5), 675/20-88(a-5), 680/25-88(a-5).

20.    The 2024 Act, like the 2003 Act before it, allows illegal aliens to qualify for in-state tuition by establishing Illinois residency.

21.    In 2019, the Illinois General Assembly passed the Retention of Illinois Students and Equity Act (hereinafter the "RISE Act"), which was signed into law and codified at 110 ILCS § 986/, with an effective date of January 1, 2020. The RISE Act extended state financial assistance to illegal aliens and also exempted such assistance from caps on grant assistance available under the Monetary Award Program ("MAP") other than those required by state law. 110 ILCS § 986/15(a), (b). The RISE Act defined "Illinois resident" to include "any person who is deemed an Illinois resident for tuition purposes under State law." 110 ILCS § 986/10. The General Assembly specified that the RISE Act was intended to provide benefits to illegal aliens, even though it did not extend eligibility for those benefits to U.S. Citizens or nationals of other states. *See id.* § 986/15(d) (citing 8 U.S.C. § 1621(d)).

22.    In 2025, the Governor of Illinois signed into law Public Act 104-0164, which amends provisions of the RISE Act, effective January 1, 2026. The Amendments expand the scope of benefits available to those covered by the RISE Act to include benefits offered by a unit of local government.

23.    The Illinois DREAM Act, Public Act 97-233, was signed into law in 2011. Among other changes, it added 110 ILCS § 947/67, which directed the ISAC to create an Illinois DREAM Fund funded by private donations and an Illinois DREAM Fund Commission. It directed the Governor to appoint nine persons to the DREAM Fund Commission and charged the Commission with various functions including establishing a not-for-profit entity for fundraising, training, and awarding scholarships; raising funds for the DREAM Fund; and selecting recipients of scholarships funded by the DREAM Fund. The residency requirements for a DREAM Fund scholarship are set forth in 110 ILCS § 947/67(c). Scholarships were awarded beginning in 2012. www.ildreamfund.org. Eventually, the Illinois DREAM Fund Commission further limited the statutory eligibility requirements to "undocumented students" in Illinois. *Id.*

24.    Each of the Defendant Universities or Colleges offer different tuition rates but they all offer discounts based on residence, such that students who qualify for Illinois residence (including aliens not lawfully present) pay reduced tuition rates. Compl. ¶¶ 52-58.

25.    The cost of tuition for Illinois resident students, including illegal aliens who qualify for residency, is often *significantly* lower than for U.S. citizens and nationals who are residents of other states. Compl. ¶ 59.

26.    ISAC offers Illinois residents a variety of grant and scholarship programs, eligibility for which is based on factors such as financial need, academic achievement, chosen field of study, or military service. The cornerstone of these programs is ISAC's need-based Monetary

Award Program ("MAP"). Each year, MAP awards over $400 million in grants to approximately 145,000 undergraduates who demonstrate a financial need for such assistance. Grants awarded through MAP cover tuition and mandatory fees. *See* www.isac.org.

27. The remaining gift aid programs offered by ISAC are more targeted in nature. They range in focus from those that recognize academic achievement or chosen field of study/profession to those that reward military service. Collectively, these targeted scholarship and grant programs award millions in gift aid to qualified applicants each year. *See id.*

28. Illinois has created a separate financial aid application for illegal aliens, called the Alternative Application for Illinois Financial Aid ("Alternative Application"), which enables illegal aliens to apply for the Illinois MAP grants, the State's largest need-based grant program for low-income college students. The Alternative Application is accessible through the ISAC website. It does not apply to U.S. Citizens, who are expected to complete the Free Application for Federal Student Aid ("FAFSA"). *See id.*

29. MAP grants are administered by Illinois state universities, including those named as Defendants, based on the eligibility criteria established by ISAC. *See* www.isac.org. MAP funding is typically insufficient to meet the demand. https://www.isac.org/students/during-college/types-of-financial-aid/grants/monetary-award-program/

30. DREAM Fund scholarships are separately administered by the Illinois Dream Fund Commission. https://www.isac.org/resources-for-non-us-citizens/#DREAM. It has awarded hundreds of scholarships and limits those scholarships to "undocumented students." *www.ildreamfund.org*. Beginning in 2024, money to support the fund is raised, in part, through Illinois Lottery scratch-off tickets. 20 ILCS § 1605/21.16.

31.     Private scholarships are available on the basis of residence within a state. *See, e.g.,*
https://www.cfnil.org/scholarships.

32.     For the year 2022, approximately 408,000 student aliens not lawfully present were
enrolled in U.S. institutions of higher education, including an estimated over 27,000 in Illinois.
*See* https://www.higheredimmigrationportal.org/state/illinois/.

**STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See Weaver v.
Speedway, LLC*, 28 F.4th 816, 818 (7th Cir. 2022). A party may "move for summary judgment 'at
any time' until 30 days after the close of discovery, regardless of whether discovery has been
completed or even begun." *F.C. Bloxom Co. v. Tom Lange Co. Int'l, Inc.*, 109 F.4th 925, 935 (7th
Cir. 2024) (quoting Fed. R. Civ. P. 56(b)). When evidence "conclusively establishes or
conclusively forecloses a party's entitlement to relief" discovery "becomes futile and wasteful."
*Id.* In those circumstances, Rule 56(b) "encourages parties to use summary judgment to bring
litigation to a 'just, speedy, and inexpensive' end." *Id.* (quoting Fed. R. Civ. P. 1).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the
sufficiency of the complaint, not its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th
Cir. 1990). In considering a Rule 12(b)(6) motion, courts accept as true all well-pleaded facts in
the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See
AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion,
the complaint must not only provide the defendant with fair notice of a claim's basis but must also
be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Dismissal is only appropriate if the plaintiff has failed to allege any set of facts upon which relief may be granted. *Gibson,* 910 F.2d at 1521.

## ARGUMENT

### I.    The United States is Entitled to Summary Judgment Because the Challenged Illinois Laws are Preempted by Section 1623

The United States is entitled to summary judgment on all three counts because each challenged Illinois law is expressly preempted by Section 1623 as applied to aliens not lawfully present in the United States. Each law includes a student's residence in the State as a criterion for eligibility for postsecondary education benefits, and such benefits are not available to United States citizens and nationals who reside outside of Illinois.

#### A.  Applicable Law

Express preemption occurs when Congress, by statute, explicitly supersedes all state enactments in a particular area. *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 203–04 (1983). Federal statutes may expressly preempt state laws by declaring that intent on the face of the statute. *Arizona*, 567 U.S. at 399; *see Chambers v. Osteonics Corp.*, 109 F.3d 1243, 1246 (7th Cir. 1997) ("Because the intent of Congress controls on issues of preemption, '[i]f the statute contains an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993))).

"Preemption fundamentally is a question of congressional intent and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990) (citations omitted); *see also Fifth Third Bank ex rel.*

*Tr. Officer v. CSX Corp.*, 415 F.3d 741, 746 (7th Cir. 2005) (in preemption analysis, "the ultimate touchstone is congressional purpose" (quotations/citations omitted)). As a result, when the statute contains an express preemption clause, the court does not indulge "any presumption against preemption but instead focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Puerto Rico v. Sanchez-Valle*, 579 U.S. 59, 125 (2016).

### B.  Section 1623 Preempts the Challenged Laws

Section 1623 begins with the language "notwithstanding any other law." 8 U.S.C. § 1623. The plain language controls, and that clause of Section 1623 "expressly preempts state rules that grant illegal aliens benefits when U.S. citizens haven't received the same." *Young Conservatives of Texas Foundation,* 73 F.4th at 312-13; *see also Joren v. Napolitano*, 633 F.3d 1144, 1146 (7th Cir. 2010) ("notwithstanding" clause "signals Congressional intent to supercede conflicting provisions in any other statute."). In other words, "public post-secondary institutions need not admit illegal aliens at all, but if they do, these aliens cannot receive in-state tuition unless out-of-state United States citizens receive this benefit." *Equal Access Educ. v. Merten,* 305 F. Supp. 2d 585, 606 (E.D. Va. 2004). Even the Defendants agree with this implication of Section 1623. Br. 16.

Section 1623 lays out three elements that, when they occur in combination, are preempted. A state law is preempted if it: (1) addresses "an alien who is not lawfully present in the United States"; (2) grants eligibility for a postsecondary education benefit "on the basis of residence within a State" to such aliens; and (3) does not also provide the same benefit eligibility "to a citizen or national of the United States" without regard to whether the citizen or national is a resident of the state. 8 U.S.C. § 1623; *see also United States v. Texas*, 350 F.R.D. 74, 80-81 (N.D. Tex. 2025) (denying intervention as futile because challenged Texas statutes made aliens not lawfully present

eligible for in-state tuition on the basis of residence, while citizens and nationals of other states were not so eligible).

Each challenged law unlawfully combines the three elements Congress specifically prohibited.

### 1. The 2003 Act and 2024 Act are Expressly Preempted

The 2003 Act addresses in-state tuition charges for Illinois state universities. *See, e.g.*, 110 ILCS §§ 305/7e-5. That section is titled "In-State tuition charge." *Id.* It covers "tuition for a term or semester that begins on or after May 20, 2003 (the effective date of Public Act 93-7) but before July 1, 2026." *Id.* The 2003 Act provides that "the Board of Trustees shall deem an individual an Illinois resident, until the individual establishes a residence outside of this State, if all of the following conditions are met" and then provides four conditions U.S. citizens and permanent residents must meet, and a fifth condition for persons who are not U.S. citizens or permanent residents. *See* 110 ILCS §§ 305/7e-5, 520/8d-5, 660/5-88, 665-10/88, 675/20-88, 680/25-88, and §805/6-4a.[1]

To establish Illinois residency for in-state tuition purposes, the student must have (1) resided with a parent or guardian while attending a public or private high school in Illinois; (2) graduated from a public or private high school in Illinois or received the equivalent of a high school diploma in Illinois; (3) attended school in Illinois for at least three years as of the date of graduation or receipt of a high school diploma equivalent; and (4) registered as an entering student no earlier than fall 2003. *See* 110 ILCS §§ 305/7e-5(a)(1)-(4), 520/8d-5(a)(1)-(4), 660/5-88(a)(1)-(4), 665-10/88(a)(1)-(4), 675/20-88(a)(1)-(4), 680/25-88(a)(1)-(4), and §805/6-4a(a)(1)-(4).

---

[1] Section 110 ILC § 805/6-4a differs slightly in that it refers to "a board" rather than the Board of Trustees, as that section applies to all community colleges which each have their own board.

Subsection (a)(5) addresses "an individual who is not a citizen or a permanent resident of the United States." *See* 110 ILCS §§ 305/7e-5(a)(5), 520/8d-5(a)(5), 660/5-88(a)(5), 665-10/88(a)(5), 675/20-88(a)(5), 680/25-88(a)(5), and §805/6-4a(a)(5). Such students must meet one additional criterion for eligibility: they must "provide[] the University with an affidavit stating that the individual will file an application to become a permanent resident of the United States at the earliest opportunity the individual is eligible to do so." *See id.*

The 2024 Act, which takes effect on July 1, 2026, retains the structure of the 2003 Act but loosens some requirements and creates additional pathways to establish residence. *See* 110 ILCS §§ 305/7e-5(a-5), 520/8d-5(a-5), 660/5-88(a-5), 665-10/88(a-5), 675/20-88(a-5), and 680/25-88(a-5).[2] First, it loosens the requirements of the 2003 Act by requiring only two years of high school attendance rather than three, and by eliminating the requirement of residing with a parent or guardian. *See id.* at (a-5)(1)(A) & (C). It retained the other elements of the 2003 Act including that a student who is not a citizen or lawful permanent resident of the United States can be eligible for in-state tuition if they submit an affidavit swearing to apply as soon as they are eligible. *Id.* at (a-5)(1)(D).

The 2024 Act also created additional pathways to showing residence through attendance at a combination of an Illinois high school and a public community college. *Id* at (a-5)(2). A student is only eligible if he "has not established residency outside of this State before enrolling at the University." *Id.* at (a-5)(2)(C). The additional pathways also apply to a student who "is not a citizen or lawful permanent resident of the United States" but completes an affidavit promising to become one when eligible. *Id.* at (a-5)(2)(D).

---

[2] There does not appear to be a parallel provision pertaining to community colleges.

Thus, the 2003 Act and the 2024 Act create an avenue for aliens not lawfully present in the United States to establish residency and obtain in-state tuition. It does not provide any such opportunity for U.S. citizens and nationals who reside in other states and instead excludes anyone who (1) has established residence in another state, (2) graduated from high school in another state, (3) for the 2003 Act only, did not live with a parent or guardian while attending high school in Illinois, or (4) for the 2003 Act did not attend school in Illinois for at least three years, or for the 2024 Act, did not attend high school for at least two years or did not attend a combination of high school and community college for at least three years. *See* 110 ILCS §§ 305/7e-5, 520/8d-5, 660/5-88, 665-10/88, 675/20-88, 680/25-88, and §805/6-4a. Because the 2003 and 2024 Acts provide eligibility for a post-secondary education benefit (in-state tuition) to aliens not lawfully present (the first prong), on the basis of residence within Illinois (the second element of Section 1623), while explicitly excluding U.S. citizens and nationals of other states from eligibility (the third prong), it unlawfully combines all three elements of Section 1623 in precisely the way that Congress proscribed. The 2003 and 2024 Acts are, therefore, expressly preempted as applied to illegal aliens.

Indeed, other courts have found similar state laws expressly preempted by Section 1623. In *United States v. Texas*, the district court concluded that Texas laws that allowed a student to establish residency for in-state tuition purposes by establishing domicile or residency in the state were expressly preempted by Section 1623 because such laws applied to aliens not lawfully admitted but did not provide the same eligibility to U.S. citizens and nationals of other states. 350 F.R.D. at 80-81. *Id.* Similarly, in *United States v. Oklahoma,* the United States challenged Oklahoma laws under which "individuals who are not lawfully present in the United States may qualify for in-state tuition or nonresident tuition waivers if they meet certain residency and high

school graduation criteria." 2025 U.S. Dist. LEXIS 169743, at *2 (E.D. Ok. Aug 7, 2025). The magistrate's report and recommendation, which was adopted by the District Court, explained that Section 1623 contains an express preemption clause and that the challenged laws were preempted. *Id.* at *4.

Here, the 2003 and 2024 Act require that the board of trustees "shall deem an individual an Illinois resident" under the conditions of the Illinois laws, thus making illegal aliens eligible for in-state tuition while denying such eligibility to U.S. citizens and nationals of other states. But Section 1623 states that aliens not lawfully present "shall not be eligible on the basis of residence within a State" unless U.S. citizens and nationals of other states are equally eligible without regard to residence. 8 U.S.C. § 1623. Indeed, the fact that the laws directly conflict is made plain by Defendants themselves. Illinois touts that it intends to stand as a "bulwark" against federal immigration policy. Br. 17.

Accordingly, because the 2003 Act and the 2024 Act are preempted by Section 1623, the United States is entitled to summary judgment on Count I of the Complaint.

## 2. The Illinois Rise Act Is Preempted

The RISE Act provides access to postsecondary education benefits for certain persons not eligible for federal financial aid, including illegal aliens. *See* 110 ILCS 986/15(a) (limiting benefits to "[a] student who is an Illinois resident and who is not otherwise eligible for federal financial aid, including, but not limited to … a noncitizen student who has not obtained lawful permanent residence"). "Illinois resident" in turn is defined as "any person who is deemed an Illinois resident for tuition purposes under State law" thus explicitly incorporating the residency requirements of the 2003 and 2024 Acts. 110 ILCS § 986/10. At the time of the Complaint, the RISE act made such persons eligible for "State financial aid and benefits as described in subsection (b)" which

include "any student aid or benefit funded or administered by the State, any State agency, or any public institution of higher learning, including, but not limited to, scholarships, grants, awards, stipends, room and board assistance, tuition waivers, or other financial or in-kind assistance." 110 ILCS 986/15(a), (b) (2020). As of January 1, 2026, that definition was expanded to also include aid "offered by a unit of local government." *See* Public Act 104-0164. Of particular note, such aid "may not be subject to any caps on grant assistance available under the Monetary Award Program other than those required by State law." *Id.* Consistent with the broad state aid available, the RISE Act explains that the "State of Illinois is committed to ensuring that all students who are residents of this State have meaningful and equitable access to higher educational opportunities notwithstanding the student's … immigration status." 110 ILCS 986/5(1). Thus, both through its plain language and the incorporated definition of "Illinois resident," the RISE Act provides postsecondary education benefits to aliens not lawfully present. Nothing in its provisions extends the benefits of the RISE Act to non-resident United States citizens. *See generally* 110 ILCS 986.

Accordingly, the RISE Act is expressly preempted by Section 1623 because it provides postsecondary education benefits to aliens not lawfully present without extending those same benefits to U.S. citizens and nationals of other states without regard to residence. *See United States v. Texas*, 350 F.R.D. at 80-81.

Thus, the United States is entitled to summary judgment on Count II of the Complaint.

### 3. The Illinois Dream Act Is Preempted

The Illinois DREAM Act is also contained within the "Higher Education" Chapter of the Illinois Consolidated Laws, 110 ILCS. The Act provides for scholarships for students who "meet all of the following qualifications: "(1) Have resided with his or her parents or guardian while attending a public or private high school in this State. (2) Have graduated from a public or private

17

high school or received the equivalent of a high school diploma in this State. (3) Have attended school in this State for at least 3 years as of the date he or she graduated from high school or received the equivalent of a high school diploma. (4) Have at least one parent who immigrated to the United States." 110 ILCS § 947/67(c). There is no exception to the residency requirements for U.S. citizens or nationals of other states. *See id.* The DREAM Act, like the 2003 Act and 2024 Act, is expressly preempted by Section 1623. It provides eligibility for a post-secondary education benefit (scholarships) to "students" who meet the residency requirement and have "at least one parent who immigrated to the United States," but it contains no limitation excluding illegal aliens nor does it make U.S. citizens and nationals of other states equally eligible without regard to residence.

Accordingly, the United States is entitled to summary judgment on Count III of the Complaint.

## II.    The Anticommandeering Doctrine Does Not Nullify the Supremacy Clause

Defendants misconstrue anticommandeering and Tenth Amendment principles so badly that a summary of this area of law is warranted to set the record straight. First, the Federal Government's authority in immigration and regulation of the status of aliens is broad and undoubted. Second, the anticommandeering doctrine does not nullify the Supremacy Clause. When the Federal Government regulates states and private parties in an evenhanded way—even if this means state laws must be struck down—it does not violate the Tenth Amendment or commandeer the states.

### A.  The Federal Government Has Broad and Undoubted Power over Immigration and The Status of Aliens

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. "This authority rests, in part, on

the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* at 394-95. The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy* v. *Mezei,* 345 U.S. 206, 210 (1953). "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co.* v. *Stranahan,* 214 U.S. 320, 339 (1909)). "The federal power to determine immigration policy is well settled" as "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws. *Arizona*, 567 U.S. at 395. "Federal governance of immigration and alien status is extensive and complex" and includes penalties for unlawful entry or reentry, alien registration requirements, penalties for employers who hire unauthorized workers, and authorization for states to deny public benefits to aliens. *Id.* Federal regulations also provide for the removal of aliens and the enforcement of federal immigration laws. *Id.* It "is a routine and normally legitimate part of the business of the Federal Government to classify on the basis of alien status, and to take into account the character of the relationship between the alien and this country, *only rarely are such matters relevant to legislation by a State.*" *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (emphasis added, quotations/citations omitted).

Consistent with these broad Congressional powers to regulate immigration matters, in August of 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") of 1996, Pub. L. 104-193 (Aug. 22, 1996) which restricted alien eligibility for many federal benefit programs. In PRWORA, Congress set forth "statements

concerning national policy with respect to welfare and immigration" including that "[i]t continues to be the immigration policy of the United States that—the availability of public benefits not constitute an incentive for immigration to the United States" and that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(2), (6). That section remains in effect today. *See id.*

Building on those principles of national immigration policy, in September of 1996, Congress enacted what is now Section 1623 of the INA, which imposed a restriction on aliens "not lawfully present in the United States" in that they "shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit … without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623. *See* Illegal Immigration Reform and Immigration Responsibility Act ("IIRAIRA") of 1996, Division C, Sec. 505, Omnibus Consolidated Appropriations Act of 1997, Pub. L. 104-208 (Sept 30, 1996).

Multiple courts have upheld the preemptive nature of Section 1623. *See Young Conservatives of Texas Foundation v. Smatresk*, 73 F.4th 304, 312-13 (5th Cir. 2023) (Section 1623 "expressly preempts state rules that grant illegal aliens benefits when U.S. citizens haven't received the same"); *United States v. Texas*, 350 F.R.D. 74 (N.D. Tex. 2025), stay pending appeal denied by Fifth Circuit, No. 25-10898 (Oct. 16, 2025) (Exhibit A)**;** *United States v. Oklahoma*, No. 25-cv-265, 2025 U.S. Dist. LEXIS 169743 (Aug. 7, 2025) (report and recommendation), *adopted by United States v. Oklahoma*, 2025 U.S. Dist. LEXIS 168579 (E.D. Okla. Aug. 29, 2025). And *no* court, in the nearly thirty-year history of that statute, has ever done what Defendants ask this Court to do: find Section 1623 unconstitutional under the Tenth Amendment.

**B. The Anticommandeering Doctrine Merely Prohibits the Federal Government From Usurping State Sovereignty**

In our dual sovereign system, the Constitution crafts a delicate balance of power, granting Congress "certain enumerated powers," but leaving "all other legislative power" "for the States." *Murphy v. NCAA,* 584 U.S. 453, 470 (2018). But our Constitution also limits a State's power via the Supremacy Clause, which establishes the rule that "when federal and state law conflict, federal law prevails and state law is preempted." *Id.* at 470. At the same time, under the core principles of federalism, the Constitution withheld from Congress "the power to issue orders directly to the States." *Id.* Thus, a federal statute within Congress's enumerated powers is the supreme law of the land, and state statutes must yield, but if a statute issues orders directly to the States or their officials, it falls outside of Congress's enumerated powers and cannot preempt state law. *Id.* at 471.

Federal laws affecting the States do not amount to direct orders to the States. Preemption may affect the States, but more is required to constitute commandeering, which amounts to directing the States to take action on matters left to the States, or coopting the state into carrying out a federal regulatory scheme. *See generally id.* at 470-73, 477-79. As an example, in *Murphy*, the Court discussed *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), in which it had previously considered the Airline Deregulation Act of 1978, which provided in part that "no State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier." *Murphy*, 584 U.S. at 478. Although that section could appear to issue a direct order to the states as to what laws they could enact, particularly because it expressly referenced the States, the Court explained that the particular preemption clause language is not dispositive. *Id.* Rather, the "provision operates just like any other federal law with preemptive effect. It confers on private entities (*i.e.*, covered carriers) a federal right to engage in certain conduct subject only

21

to certain (federal) constraints." *Id.* at 478-79. That makes sense given *every* federal law with preemptive effect, including Section 1623, limits the laws a state may enact. That is the very nature of preemption. *See South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988) ("That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.").

The Supreme Court's Tenth Amendment jurisprudence covers a different set of circumstances entirely: those in which "the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157 (1992). Under the Tenth Amendment, "Congress may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981)). But that requires a command to the states that compels them to act. In *Hodel*, the federal law was upheld as constitutional because it regulated the mining operators and did not *compel* states to enforce federal mining standards, expend resources, or participate in the federal program at all, rather, if they *chose to participate*, they were required to comply with the Act. *Id.* The Court in *Hodel* explained, "[w]e fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress *chose to allow* the States a regulatory role." *Hodel*, 452 U.S. at 290 (emphasis added). In other words, the statute in *Hodel* was not viewed as a command to the states even though it carried with it certain requirements for the states to comply with. *New York*, 505 U.S. at 167.

In *New York*, the Supreme Court upheld parts of the challenged act as constitutional because those parts relied on enumerated powers of Congress, including the Commerce Clause and the

Spending Clause, and gave states the option of participating in the regulatory scheme. *New York*, 505 U.S. at 173-74. One provision, however, required the states to either regulate nuclear waste in accordance with the federal program or take title to the nuclear waste. *Id.* at 175. Because Congress did not have the authority to impose either requirement standing alone, and a state could not decline to participate, Congress did not have the authority to impose the choice between the two options (both of which required the states to take affirmative steps), and the provision violated the Tenth Amendment. *Id.* at 175-76. Thus, a constitutional problem arises when a state is forced to participate in a program; there is no Tenth Amendment issue if a state may decline to participate in a federal regulatory program.

*Printz*, decided five years later, is in accord with *New York*. There, the federal statute *required* state law enforcement officers to perform background checks on handgun purchasers seeking to purchase from firearm dealers until a federal background check system could be implemented. *Printz v. United States*, 521 U.S. 898, 902-03 (1997). The Court affirmed its holding in *New York* that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* at 933 (quoting *New York,* 505 U.S. at 188). Thus, *Printz* held that the Tenth Amendment prohibited conscripting state officials to perform functions of the regulatory scheme.

Finally, in *Murphy*, the Supreme Court addressed a federal law prohibiting states from authorizing sports gambling. *Murphy*, 584 U.S. at 474. Unlike immigration and alien status, gambling is traditionally regulated by the states. *Id.* at 459-461 (discussing history). At the time of the federal law at issue, most states had banned sports gambling. *Id.* at 462. The federal law prohibited states from authorizing sports gambling, making it "unlawful" for "a State or any of its subdivisions 'to sponsor, operate, advertise, promote, license, or authorize by law or compact . . .

23

a lottery, sweepstakes, or other betting, gambling, or wagering scheme based . . . on' competitive sporting events." *Id.* at 461 (quoting 28 U.S.C. § 3702(1)). The Supreme Court first held that "authorize by law" included both enacting an affirmative law allowing sports gambling and rescinding a current law prohibiting gambling. *Id.* at 467. As a result, it compelled states to maintain their current bans on sports gambling which could only be understood as a directive to state legislatures. *Id.* at 480. Part of the court's reasoning was that private parties were not regulated because the law did not give private parties a right to engage in sports gambling, nor did it prohibit them from starting a sports gambling operation. *Id.* The Court observed that a second provision within the law did regulate private parties, because it prohibited "a private actor from 'sponsor[ing],' 'operat[ing],' or 'promot[ing]' sports gambling schemes 'pursuant to' state law." *Id.* at 483 (quoting 28 U.S.C. § 3702(2)). However, that provision was not severable from the first and could not survive. *Id.*

From these cases it is apparent that if Congress fails to regulate private parties and issues direct commands to states, particularly in an area outside of its enumerated powers (such as in *Murphy*), a statute may be unconstitutional. But here, Section 1623 is nothing more than the substantive exercise of Congress's plenary immigration power that governs who may receive certain public benefits. Its incidental effect on state legislative discretion is the ordinary and constitutionally unobjectionable byproduct of valid preemption, not an independent anticommandeering violation.

In short, the anticommandeering doctrine safeguards state sovereignty by prohibiting the federal government from directly usurping the states' legislative authority or conscripting them into federal regulatory schemes; it does not shield states from the ordinary preemptive force of valid federal law enacted within Congress's enumerated powers.

### III.    Section 1623 of the Immigration and Nationality Act Is a Constitutional Exercise of Congress's Enumerated Immigration Powers

In enacting Section 1623, Congress sought to, as the statute's title suggests, limit preferential treatment of illegal aliens on the basis of residence for higher education benefits. Section 1623 regulates private individuals, namely aliens, and the statute prevents anyone—private actors and states alike—from interfering with the Federal Government's ability to do so. As such, Section 1623 is a valid preemption provision, and Defendants' contentions otherwise, Br. 12-17, rely on a strained and implausible reading of the statute.

As articulated in *Murphy*, in order for a federal provision to preempt state law, it must (1) "represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do"; and (2) "be best read as one that regulates private actors." 584 U.S. 453, 477 (2018). Defendants concede, as they must, that Section 1623 "represent[s] the exercise of a power conferred on Congress by the Constitution." Br. 12-13. Therefore, the parties agree that Section 1623 meets the first prong of the *Murphy* test. The only dispute between the parties is whether Section 1623 is best read as regulating private actors. It undoubtedly does.

Defendants attempt to argue that Section 1623 is unconstitutional because, in their view, (i) it regulates states rather than private actors; (ii) issues orders directly to the states; and, inventing its own prong of the *Murphy* test found nowhere in case law in this circuit or any other, (iii) granting Defendants' motion to dismiss would promote individual liberty and political accountability. Each of Defendants' three arguments fails. Section 1623 regulates aliens, applies evenhandedly to non-state and state actors, and, no matter how much Illinois disagrees with Congress, it cannot, in our Constitutional system, supplant federal law.

### A.  Section 1623 Regulates Aliens not States

On its face, Section 1623 unequivocally regulates aliens, United States citizens, and nationals. It applies to "an ***alien*** who is not lawfully present in the United States" and it places a restriction on such aliens. The "alien" "shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless" certain conditions are met. 8 U.S.C. § 1623. Those conditions are that citizens and nationals of the United States are "eligible" for the same benefit "without regard to whether the citizen or national is such a resident." *Id.* Section 1623 thus regulates—that is, provides benefits to or restrictions on—private parties including aliens (restrictions), and U.S. citizens and nationals (benefits) by restricting aliens from being eligible to receive benefits based on residence unless citizens and nationals are eligible for the same benefits without regard to residence. *See Murphy*, 584 U.S. at 477, 478-79**.**

Plaintiffs also argue that Section 1623 does not regulate private parties because it does not prevent aliens from accepting benefits, nor does it require that citizens or nationals receive the same benefits. Br. 15. But just as the law in *Morales*, which prevented states from regulating airline routes, regulated private parties (airlines), so too does Section 1623 because it regulates what benefits an alien may be eligible for. Furthermore, at least one appellate court has noted that any preemption analysis involving sections of the INA must take into account the fact that the INA as a whole "certainly confers rights and places restrictions on large numbers of private persons." *New York v. United States Dep't of Justice*, 951 F.3d 84, 114 (2d Cir. 2020) (noting that district court's preemption analysis that focused on statutory language relating to government entities and officials in 8 U.S.C. § 1373 "may have been too narrow"). That is particularly true here where the statute does not mention the states at all.[3]

---

[3] Plaintiffs argue that, based on *Murphy*, this court should not be "'confused by the way' that section 1623 'is phrased.'" Br. 13 (partially quoting *Murphy*, 584 U.S. at 478). What *Murphy* actually says is that the

Plaintiffs cite *McHenry County v. Raoul*, 44 F.4th 581, 588 (7th Cir. 2022), which in turn cites *Ocean County Board of Commissioners v. Attorney General*, 8 F.4th 176, 181-82 (3d Cir. 2021), for the proposition that courts have rejected preemption challenges brought under federal immigration statutes that do not regulate private actors. Br. 11. *McHenry County* did not resolve whether the statute at issue there regulated private parties. 44 F.4th at 587. *Ocean County* is not binding on this Court, is inconsistent with rulings in other districts, and was wrongly decided.[4] Of note, *Ocean County* addresses the same statutory section, 8 U.S.C. § 1373, that the Second Circuit addressed in *New York v. U.S. Dep't of Justice*, where the court found New York law preempted by Section 1373 as applied in the federal funding context. 951 F.3d at 114. Likewise, an earlier Second Circuit case, *City of New York v. United States*, rejected the City's facial challenge to Section 1373 in which the City argued that Section 1373 was unconstitutional under the Tenth Amendment. 179 F.3d 29, 24 (2d Cir. 1999). In rejecting the City's position, the Second Circuit explained that "[t]he City's sovereignty argument asks us to turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *Id.* at 35. So too here. If the states could wield a Tenth Amendment sword every time Congress, under an enumerated power, enacted a federal policy with which a state disagrees, Congress's ability to regulate would be destroyed. Yet that is what Illinois asks this Court to do.

---

preemption language of the Airline Deregulation Act at issue in *Morales* "might appear to operate directly on the States, but it is a mistake to be confused by the way in which a preemption provision is phrased." *Murphy*, 584 U.S. at 478. In other words, an express preemption provision such as the one in *Morales* that says "no State or political subdivision thereof . . . shall enact or enforce any law,…" does not necessarily indicate that the provision regulates the states rather than private actors. *Id.* The situation here is reversed— there is no express language addressing the states in Section 1623.

[4] Section 1373 is a valid preemption provision because it does not compel information sharing or create new duties but merely prohibits anyone from preventing information exchange between local and federal law enforcement authorities.

But ultimately other provisions of Title 8 are irrelevant and Section 1623 both on its face

and in practice, unequivocally regulates "an alien," not states or the agents of states. 8 U.S.C.

§ 1623. Thus, *McHenry County* and *Ocean County* are inapposite and do not control—or even

influence—the outcome here. And since Section 1623 explicitly names the private actor regulated

by the statute, it goes beyond what is required to have preemptive effect. *CoreCivic, Inc. v. Murphy*,

690 F. Supp. 3d 467, 490 (D.N.J. 2023), aff'd sub nom. *CoreCivic, Inc. v. Governor of New Jersey*,

2025 WL 2046488 (3d Cir. July 22, 2025) ("[T]he Court does not read these cases to require that

federal law must explicitly name a private actor in order to have preemptive effect").

### B. Section 1623 Applies to Anyone Who Makes Aliens Eligible for Postsecondary Education Benefits on the Basis of Residence

Plaintiffs candidly admit that Section 1623 "does not expressly address the states as

regulated entities." Br. 13. Yet they nonetheless assert that Section 1623 "unequivocally dictates

what a state legislature may and may not do." Br. 12. That "unequivocal" command is, they say,

embedded in the word "eligible." Br. 12. According to Plaintiffs, any eligibility determination for

postsecondary education benefits that is made on the basis of residence is done by the state, and

thus Section 1623 necessarily regulates states and only the states by dictating what their eligibility

requirements must be. Br. 14. As an initial matter, it is not difficult to find private scholarships

available on the basis of residence within a state. *See, e.g., https://www.cfnil.org/scholarships*. That

alone refutes Illinois' claim that Section 1623 solely regulates the states. *See Haaland v. Brackeen*,

599 U.S. 255, 281-82 (2023) (finding no commandeering because involuntary foster care

placement could be initiated by parties other than the state).

Defendants' argument also misconstrues Tenth Amendment jurisprudence by suggesting

any limitation on a state is a violation of the anti-commandeering rule. That is not, and logically

cannot be, the law. *Any* federal law that preempts a State law necessarily has the practical effect of

28

telling a State that it may not do something. *Murphy,* 584 U.S. at 477 ("Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted."). That is not a direct command to the states; it is the natural effect of the Supremacy Clause. That was true in *Morales,* 504 U.S. at 383, which restricted the states' ability to impose regulations on airline routes, in *South Carolina,* 485 U.S. at 514-15, which taxed unregistered state bonds to cause states to issue registered bonds, and in *City of N.Y. v. United States,* 179 F.3d at 31, 35, in which the Second Circuit found a New York law that "prohibit[ed] its employees from voluntarily providing federal immigration authorities with information concerning the immigration status of any alien" in direct conflict with 8 U.S.C. § 1373 which prohibited such restrictions. 179 F.3d at 31, 35. When a state and federal law conflict, the state law must yield.

Though Defendants' claim that Section 1623 issues orders directly to the states, Section 1623 does not direct state legislatures, commandeer state employees, or require the States to expend any resources. *See Hodel,* 452 U.S. at 288. Rather, like the law upheld in *Hodel,* it gives the States a choice. States can decide that aliens not lawfully present are not eligible for postsecondary education benefits under any conditions, or they can decide to make such aliens eligible based on criteria other than residence, or they can choose to make such eligibility dependent upon residence, in whole or in part. Only if the states choose to provide postsecondary education benefits to illegal aliens with residence as a criterion, as Illinois has done, must the states also provide that eligibility to United States citizens and nationals regardless of their residence, in accordance with Section 1623. *See Equal Access Educ.,* 305 F. Supp. 2d at 606 ("The more persuasive inference to draw from § 1623 is that public post-secondary institutions need not admit

29

illegal aliens at all, but if they do, these aliens cannot receive in-state tuition unless out-of-state United States citizens receive this benefit."). Plaintiffs argue that the nature of the statute, which they describe as "if you do x, you must do y" is a direct command to the States. Br. 16. But there can be no direct command, if Section 1623 only operates *if* a state chooses a particular path. They are not required to do so.

Defendants also argue, curiously, that even if Section 1623 regulates private parties, it also regulates the states and therefore is unconstitutional. Br. 16. This argument gets the law exactly wrong. "Legislation that applies 'evenhandedly' to state and private actors does not typically implicate the Tenth Amendment." *Haaland*, 599 U.S. at 283. To the extent the court finds that Section 1623 regulates those who provide postsecondary benefits to illegal aliens, it regulates all such parties equally, whether the state or a private party. And as noted, *supra*, it is not difficult to find private parties who offer postsecondary educational benefits such as scholarships, based on residence. Since Section 1623 is even-handed in who it applies to, the fact that Illinois law confers such eligibility is no bar the federal provision's preemptive effect.

Even if this were a close call—and the United States asserts that it is not—it should be resolved in favor of the constitutionality of the statute. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988); *see also New York*, 505 U.S. at 170 ("This rule of statutory construction pushes us away from petitioners' understanding of § 2021c(a)(1)(A) of the Act, under which it compels the States to regulate according to Congress' instructions."). This is particularly true because Section 1623 was enacted after *New York v. United States*, which held that the Federal

Government cannot compel the states to enact a federal program, 505 U.S. at 188, and Congress is presumed to know the law. *Albernaz v. United States*, 450 U.S. 333, 341 (1981).

### C. Illinois' Contrary Policy Preferences Cannot Change That Section 1623 is the Supreme Law of the United States

While touting "structural" concerns with Section 1623, Br. 17, Defendants ignore the structural integrity of the United States Constitution which has established a federal system of dual sovereignty but that also establishes that Federal law is the supreme law of the land. U.S. Const. art. VI, cl. 2. But all of Defendants' arguments in Section III.C of its brief are beside the point and form no part of the test the Supreme Court has laid out for assessing when a Federal Law unlawfully commandeers the states. *Murphy*, 584 U.S. at 470-72. There is simply no test in the commandeering context that requires this Court to balance equities. But that is precisely what Defendants would have this Court do. They are wrong. All the Court must do, given that the Defendants do not challenge the first prong of the *Murphy* test, is determine whether Section 1623 represents the unlawful federal usurpation of the Illinois General Assembly, or whether any incidental effect on state law is merely the predictable and constitutionally ordinary consequence of Congress exercising its plenary power to regulate immigration. *Haaland*, 599 U.S. at 281-82. This Court can safely ignore Defendants' attempt to smuggle their preferred equities into a test about statutory interpretation.

Defendants view their challenged laws as "a bulwark against the federal government's increasingly cruel and unjustified approach to undocumented students[.]" Br. 17. However Illinois might wish to characterize Congress's laws, they remain the laws of the United States and preempt conflicting state law—no matter how strongly Illinois disagrees with Congressional decisions. Defendants' statements are telling: Illinois candidly concedes that it wishes to undermine Congressional immigration policy and supersede such policy with policies of its own. But

immigration is a broad, enumerated power of *Congress*, not the states. *Arizona*, 567 U.S. at 394. The fifty states cannot, given the Supremacy Clause, create their own patchwork immigration policy as Illinois wishes. *See id.* at 395.

Defendants claim "the people of Illinois have spoken through their representatives in the state legislature" to provide illegal aliens with "the same education benefits as their friends and neighbors who are American citizens." *Id.* First, whether the legislature of Illinois effectively represents the will of the people of Illinois is not relevant to this Court's determination. But even if Illinois' legislature functioned as an exemplary democracy, that would not change the analysis here: if Illinois wishes to provide resident tuition benefits to illegal aliens on the basis of residency it can do so as long as it makes such benefits available to non-resident United States citizens. Second, the Congress of the United States also reflects the will of the people, not just of Illinois, but of the whole Nation. Both parties in this case and this Court are bound by its decisions. "States must find their protection from congressional regulation through the national political process[.]" *South Carolina*, 485 U.S. at 512.

Defendants also assert that "[i]f the federal government insists on depriving undocumented students of opportunities to receive a college education then [the Federal Government] must undertake the effort in its own name." *Id.* First, Defendant's misstate the effect of Section 1623 which is not to deprive anyone of opportunities to go to college. If Plaintiffs prevail in this case, illegal aliens will still be able to enroll in college in Illinois for the same cost as every United States citizen that resides outside of Illinois. Second, Congress already has undertaken to pass Section 1623 "in its own name" by making its will known through the legislative process. And its "name"—the Congress of the United States of America—means that the laws it passes are "the Supreme Law of the Land." U.S. Const. Art. IV, cl. 2.

IV.    **The United States is Entitled to An Injunction**

A.  **Injunction Factors**

To establish entitlement to an injunction a plaintiff is required to show the traditional injunction factors that (1) it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc*., 8 F.4th 531, 545 (7th Cir. 2021). Further, "the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). The balance of harms and public interest factors "merge when the Government is the opposing party." *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here the injunction factors are easily met.

*First*, the United States has suffered irreparable injury and there is no remedy at law. Control over immigration is both a sovereign prerogative and an enumerated power of Congress. *Arizona*, 567 U.S. at 394-95. Federalism as embodied in the Constitution requires that certain powers belong to the national sovereign, while others are reserved to the states. *Murphy*, 584 U.S. at 470. Immigration belongs to the "national sovereign, not the 50 separate States." *Arizona*, 567 U.S. at 395. Yet, Illinois seeks to upset this constitutional order by establishing its own immigration policy via state laws, in direct conflict with federal immigration law, so as to serve as a "bulwark against" federal immigration policy. Br. 17. Illinois' blatant challenge to the Constitution and the bedrock principles of Federalism that undergird our rule of law as a nation causes irreparable harm to the United States. *See New Orleans Pub. Serv., Inc. v. Council of City*

*of New Orleans*, 491 U.S. 350, 366-67 (1989) (suggesting that "irreparable injury may possibly be established … by a showing that the challenged state statute is flagrantly and patently violative … of the express constitutional prescription of the Supremacy Clause"); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (finding irreparable harm where Supremacy Clause is violated); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (same).

The United States is also irreparably harmed because Illinois' challenged laws frustrate its immigration laws and policies. Congress, with Section 1623, chose to limit eligibility for post-secondary education benefits for aliens not lawfully present unless U.S. citizens and nationals of other states were equally eligible without regard to residence. That was in keeping with Congress's express statements of national immigration policy found in Section 1601, emphasizing self-sufficiency and the removal of public benefits as an incentive to illegal immigration. 8 U.S.C. § 1601. Congress also instructed that "the immigration laws of the United States should be enforced vigorously and uniformly," *see* Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 338. Illinois chose to undermine Congress with its challenged laws. But individual states "may not pursue policies that undermine federal law." *Arizona*, 67 U.S. at 416. Without this Court's intervention, the challenged laws will impede the federal government's law and policy expressed in Section 1623, allowing the State to supplant the will of the Federal Sovereign in an area of law expressly assigned to the Federal Sovereign's political branches

Furthermore, a failure to enjoin these laws will invite other States to enact their own laws, resulting in a patchwork system of laws severely undermining the "integrated scheme of regulation created by Congress." *Arizona*, 567 U.S. at 402 (internal quotations and citation omitted). Defendants cannot be rewarded for unconstitutionally second-guessing the Federal Sovereign,

34

resisting Congress's will, and frustrating federal programs. *Cf. City of New York*, 179 F.3d at 35 (rejecting City's sovereignty argument as seeking to allow "states and localities to engage in passive resistance that frustrates federal programs."). That is particularly true here because "the public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting cases). The only remedy for such harms is to enjoin the laws; there is no adequate remedy at law.

  *Second*, the balance of hardships and public interest tip decidedly in favor of the United States. The public has a strong interest in maintaining our system of federalism and the Constitutional lines drawn between Federal and State power, as that is the very bedrock of our system of law and our nation. Illinois' challenged laws undermine the constitutional framework of our nation. For that reason, the public also has no interest in enforcing Illinois' unconstitutional laws. *See, e.g.*, *Odebrecht Constr. v. Sec'y, Fla. DOT*, 715 F.3d 1268, 1290 (11th Cir. 2013) ("[T]he State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute."); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation."). The public does, however, have a strong interest in enforcing its own political choices represented through the immigration laws enacted by Congress. *Blackie's House of Beef, Inc.*, 659 F.2d. at 1221. To the extent members of the public in Illinois disagree with federal immigration policy, they can address those concerns to their elected representatives in the U.S. Congress. Moreover, there is little hardship to the Defendants because the challenged laws need only be enjoined *as applied* to illegal aliens. The rest of Illinois' resident tuition scheme can remain in place. Should Illinois wish to revise its laws to comply with Section 1623, it has various options open to it.

Illinois could (i) provide one tuition rate to residents and non-residents alike while permitting illegal aliens to attend its colleges and universities, (ii) retain its resident-tuition scheme but exclude illegal aliens from eligibility for post-secondary education benefits on the basis of residence, or (iii) provide benefits to residents and illegal alien residents based on other factors such as financial need or merit, rather than residence. Indeed, as noted in the Complaint, two similar Illinois Statutes are simply not enforced by the colleges to which they pertain because those schools do not have differing rates for in-state and out-of-state tuition. Compl. ¶ 1 n.1; *see also* Br. at 3 n.2.

Thus, the United States has shown that it is entitled to injunctive relief.

### B. Injunction Scope

The United States respectfully requests that the injunction bind all defendants and the persons and entities indicated in section Fed. R. Civ. P. 65(d)(2), including the parties' successors and assigns. *See Herrlein v. Kanakis,* 526 F.2d 252, 254 (7th Cir. 1975) (nonparty may be bound as successor in interest).

The United States also requests that the scope of the injunction cover the challenged laws and any laws that are substantially similar in scope, to avoid a situation in which new laws are promulgated with minor changes that fail to remedy the conflicts with and preemption by Section 1623.

Finally, the United States requests that the challenged laws, and their implementation, are enjoined only as applied to "aliens not lawfully present" in the United States. Illinois can retain its in-state tuition laws on the basis of residency so long as it otherwise complies with Section 1623. This Court can afford complete relief to Plaintiffs without disturbing Illinois' statutory scheme which creates postsecondary education benefits for United States citizen residents of Illinois.

## CONCLUSION

For the foregoing reasons, the United States of America asks that this court (1) find Section 1623 is a valid statute that does not violate the Tenth Amendment; (2) find that all of the challenged laws are preempted by Section 1623 and thus cannot stand; (3) enter summary judgment for the United States on all three counts of the Complaint; (4) find that the United States has met its burden for injunctive relief; (5) enter an injunction enjoining the challenged Illinois laws and their implementation, and any substantially similar laws, as applied to illegal aliens, and (6) deny Defendants' motion to dismiss.

Respectfully submitted,

STEVEN D. WEINHOEFT
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF ILLINOIS
NINE EXECUTIVE DRIVE
FAIRVIEW HEIGHTS, ILLINOIS 62208
TEL: (618) 628-3700
FAX: (618) 628-3720
STEVEN.WEINHOEFT@USDOJ.GOV

STANLEY E. WOODWARD, JR.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General

ABHISHEK S. KAMBLI
Deputy Associate Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

ALESSANDRA FASO
Acting Associate Director

By: /s/ Alexandra McTague
ALEXANDRA MCTAGUE
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel. 202-718-0483
Fax: 202-305-7000
alexandra.mctague2@usdoj.gov

*Attorneys for the United States of America*

37