**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

UNITED STATES OF AMERICA,

     Plaintiff,

v.

STATE OF ILLINOIS et al.,

     Defendants.

No. 3:25-cv-01691-DWD

Honorable David W. Dugan

---

**DEFENDANTS' COMBINED REPLY IN FURTHER SUPPORT
OF THEIR MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO
<u>PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS</u>**

KWAME RAOUL
Illinois Attorney General

Darren Kinkead
Aleeza Strubel
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

RESPONSE TO STATEMENT OF MATERIAL FACTS ............................................... 3

ARGUMENT ............................................................................................................ 10

I.      The challenged Illinois laws comply with section 1623(a). ............................. 10

II.     Section 1623(a) violates the anticommandeering doctrine. .............................. 13

        A.      Section 1623(a) regulates states rather than private actors. ................. 14

                1.      Section 1623(a) does not regulate American citizens. ............... 14

                2.      Section 1623(a) does not regulate private foundations. ............ 15

                3.      Section 1623(a) does not regulate aliens. ................................ 19

        B.      Even if section 1623(a) regulates private actors, it still violates the
                anticommandeering doctrine because it also issues a direct order to states. ........ 23

III.    The Court should craft fair and appropriate equitable relief. ........................... 25

        A.      Any injunction should apply only to the laws challenged in the complaint. ........ 26

        B.      Any injunction should be limited to what is necessary, fair, and workable. .......... 28

CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*A.R.M.R. v. United States*, No. 24-cv-2416-DWD,
  2025 WL 3485705 (S.D. Ill. Dec. 4, 2025) ................................................................. 17

*American Can Co. v. Mansukhani*,
  742 F.2d 314 (7th Cir. 1984) ................................................................................... 26

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Service*,
  220 F. Supp. 3d 27 (D.D.C. 2016) .......................................................................... 18

*Anwo v. INS*,
  607 F.2d 435 (D.C. Cir. 1979) .................................................................................. 11

*Associated General Contractors of America v. Columbus*,
  172 F.3d 411 (6th Cir. 1999) ................................................................................... 27

*ATC Vancom of California, L.P. v. NLRB*,
  370 F.3d 692 (7th Cir. 2004) ................................................................................... 27

*Barnett v. Raoul*,
  756 F. Supp. 3d 564 (S.D. Ill. 2024) ........................................................................ 30

*Beecham v. United States*,
  511 U.S. 368 (1994) .................................................................................................. 18

*Berger v. North Carolina State Conference of the NAACP*,
  597 U.S. 179 (2022) ................................................................................................... 2

*Biden v. Nebraska*,
  600 U.S. 477 (2023) .................................................................................................. 19

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) .................................................................................................. 16

*Davis v. Monroe County Board of Education*,
  526 U.S. 629 (1999) .................................................................................................. 15

*Day v. Bond*,
  500 F.3d 1127 (10th Cir. 2007) ............................................................................... 14

*Denlinger v. Brennan*,
  87 F.3d 214 (7th Cir. 1996) ..................................................................................... 11

iii

*Department of Homeland Security v. Regents of the University of California*,
591 U.S. 1 (2020) ............................................................................. 1, 22, 29

*Dersch Energies, Inc. v. Shell Oil Co.*,
314 F.3d 846 (7th Cir. 2002) ........................................................... 18

*Dubin v. United States*,
599 U.S. 110 (2023) ......................................................................... 16

*Dupuy v. Samuels*,
465 F.3d 757 (7th Cir. 2006) ........................................................... 26

*Ellingburg v. United States*,
No. 24-482, 2026 WL 135982 (U.S. Jan. 20, 2026) ........................ 17

*Fagiano v. Police Board of the City of Chicago*,
456 N.E.2d 27, 98 Ill. 2d 277 (1983) .............................................. 12

*Federation of Advertising Industry Representatives v. Chicago*,
326 F.3d 924 (7th Cir. 2003) ........................................................... 11

*Flast v. Cohen*,
392 U.S. 83 (1968) ........................................................................... 27

*Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*,
554 U.S. 33 (2008) ........................................................................... 17

*Graefenhain v. Pabst Brewing Co.*,
870 F.2d 1198 (7th Cir. 1989) ......................................................... 3

*Gunville v. Walker*,
583 F.3d 979 (7th Cir. 2009) ........................................................... 9

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ......................................................................... 24

*Hakkila v. Consolidated Edison Company of New York, Inc.*,
745 F. Supp. 988 (S.D.N.Y. 1990) .................................................. 13

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) ......................................................................... 28

*Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*,
452 U.S. 264 (1981) ......................................................................... 25

iv

*Illinois Association of Firearms Retailers v. Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ................................................................ 3

*In re A & F Enterprises, Inc. II*,
    742 F.3d 763 (7th Cir. 2014) ........................................................................ 30

*Indiana Harbor Belt Railroad v. American Cyanamid Co.*,
    916 F.2d 1174 (7th Cir. 1990) ........................................................................ 3

*Lemon v. Kurtzman*,
    411 U.S. 192 (1973) ................................................................................... 28

*Liebhart v. SPX Corp.*,
    998 F.3d 772 (7th Cir. 2021) ........................................................................ 27

*López Belloza v. Hyde*,
    No. 25-13499-RGS, 2026 WL 125168 (D. Mass. Jan. 16, 2026) ................................... 22

*Martinez v. Regents of the University of California*,
    241 P.3d 855 (Cal. 2010) .............................................................................. 11

*McCarthy v. Fuller*,
    810 F.3d 456 (7th Cir. 2015) ........................................................................ 26

*MCM Management Corp. v. Hudson Insurance Co.*,
    645 F. Supp. 3d 866 (N.D. Ill. 2022) ................................................................. 9

*Meredith v. Winter Haven*,
    320 U.S. 228 (1943) ................................................................................... 28

*Mississippi Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989) ............................................................................... 12, 13

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ......................................................................... 3

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ................................................ 2, 14, 19, 20, 21, 23, 25

*NAACP v. American Family Mutual Insurance Co.*,
    978 F.2d 287 (7th Cir. 1992) ........................................................................ 16

*National Organization for Women, Inc. v. Scheidler*,
    396 F.3d 807 (7th Cir. 2005) ........................................................................ 27

*Plyler v. Doe,*
　　457 U.S. 202 (1982) ............................................................ 1, 22, 29

*Printz v. United States,*
　　521 U.S. 898 (1997) .............................................................. 22, 23

*Providence v. Barr,*
　　954 F.3d 23 (1st Cir. 2020) ............................................................ 18

*Pulsifer v. United States,*
　　601 U.S. 124 (2024) ...................................................................... 18

*Reno v. Condon,*
　　528 U.S. 141 (2000) ...................................................................... 24

*Rudisill v. McDonough,*
　　601 U.S. 294 (2024) ...................................................................... 16

*South Carolina v. Baker,*
　　485 U.S. 505 (1988) ...................................................................... 24

*Starbucks Corporation v. McKinney,*
　　602 U.S. 339 (2024) ...................................................................... 28

*Sykes v. Cook Inc.,*
　　72 F.4th 195 (7th Cir. 2023) ........................................................ 14

*TransUnion LLC v. Ramirez,*
　　594 U.S. 413 (2021) ...................................................................... 27

*Travis v. Reno,*
　　163 F.3d 1000 (7th Cir. 1998) ...................................................... 24

*Trump v. CASA, Inc.,*
　　606 U.S. 831 (2025) ...................................................................... 28

*United States v. Apex Oil Co.,*
　　579 F.3d 734 (7th Cir. 2009) ........................................................ 26

*United States v. Fisher,*
　　6 U.S. 358 (1805) .......................................................................... 17

*United States v. Lopez,*
　　514 U.S. 549 (1995) ...................................................................... 20

*United States v. Oklahoma*,
    No. 25-CV-265-RAW-DES, 2025 WL 2815662 (E.D. Okla. Aug. 7, 2025) .................... 2

*United States v. Texas*,
    144 S. Ct. 797 (2024) ................................................................................................ 30

*Villas at Parkside Partners v. Farmers Branch*,
    577 F. Supp. 2d 880 (N.D. Tex. 2008) ...................................................................... 27

*Vlandis v. Kline*,
    412 U.S. 441 (1973) .................................................................................................. 12

*Will v. Michigan Department of State Police*,
    491 U.S. 58 (1989) .................................................................................................... 16

*Yellen v. Confederated Tribes of Chehalis Reservation*,
    594 U.S. 338 (2021) .................................................................................................. 16

*Young Conservatives of Texas Foundation v. Smatresk*,
    73 F.4th 304 (5th Cir. 2023) ..................................................................................... 14

*Younger v. Harris*,
    401 U.S. 37 (1971) .................................................................................................... 27

**Statutes**

8 U.S.C. § 1101 .................................................................................................................. 11

8 U.S.C. § 1373 .................................................................................................................. 23

8 U.S.C. § 1601 .................................................................................................................. 18

8 U.S.C. § 1621 .................................................................................................................. 17

8 U.S.C. § 1622 .................................................................................................................. 17

8 U.S.C. § 1623 ............................................................................................................. 1, 13

8 U.S.C. § 1624 .................................................................................................................. 17

8 U.S.C. § 1625 .................................................................................................................. 17

42 U.S.C. § 1983 ................................................................................................................ 15

110 ILCS 305/7e-5 ....................................................................................................... 12, 13

110 ILCS 520/15 ................................................................................................................ 28

Kan. Stat. Ann. § 76-731a ................................................................................................. 1

Neb. Rev. Stat. § 85-502 .................................................................................................... 1

Okla. Stat. tit. 70, § 3242 .................................................................................................. 1

Tex. Educ. Code § 54.051 .................................................................................................. 1

Tex. Educ. Code § 54.052 .................................................................................................. 1

**Regulations**

13 Ky. Admin. Regs. 2:045, § 8 ......................................................................................... 1

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................... 3, 9

Fed. R. Civ. P. 65 ............................................................................................................ 26

**Other Authorities**

Alex Quigley, "Modest tuition increases approved for incoming freshmen at U of I System universities" (Jan. 15, 2026) ............................................................................ 29

Appellant's Brief, *United States v. Illinois*, No. 25-2904 (7th Cir. Jan. 22, 2026) ...................... 23

Board of Trustees of Southern Illinois University, "Agenda" (Feb. 5, 2026)............................... 29

Illinois House Bill 5093, 104th General Assembly ........................................................................11

Public Law 104-208, § 505 ............................................................................................... 17

SIU Board of Trustees Meeting, "Board of Trustees Meeting 2/5/26"........................................ 29

University of Illinois System Residency Status Policy................................................................. 12

## INTRODUCTION

Almost three decades ago, Congress enacted 8 U.S.C. § 1623(a) to ensure that "alien[s] who [are] not lawfully present in the United States shall not be eligible" for higher education benefits "on the basis of residence within a State." What happened next might seem surprising: states began enacting laws to make undocumented students who graduated from local high schools eligible for in-state tuition at their colleges and universities. And it wasn't just the states you might think. *E.g.*, Kan. Stat. Ann. § 76-731a; 13 Ky. Admin. Regs. 2:045, § 8(4)(a); Neb. Rev. Stat. § 85-502(9); Okla. Stat. tit. 70, § 3242; Tex. Educ. Code §§ 54.051(m), 54.052(a).

Like many of its sister states, Illinois has long allowed undocumented students who attended high school in the state to access the same higher education benefits as their classmates. Most of the laws challenged here were enacted in 2003; for perspective, many children born in that year have already graduated from college. And until very recently, no one from the federal government batted an eye. Not even the first Trump administration suggested that these Illinois laws might be preempted by section 1623(a).

Why have so many states, from all across the political spectrum, enacted laws affording higher education opportunities to undocumented students who attended high school in their communities? Perhaps because "education has a fundamental role in maintaining the fabric of our society": it "provides the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Plyler v. Doe*, 457 U.S. 202, 221 (1982). And states have a strong interest in ensuring that undocumented students, who are typically "'productive young people' who were brought here as children and 'know only this country as home,'" remain productive members of our communities. *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 29 (2020).

1

Section 1623(a) does not stand in the states' way: it is not a valid preemption provision but rather a blatant violation of the anticommandeering doctrine. To be sure, the federal government is correct that "*no* court, in the nearly thirty-year history of that statute, has ever" held that section 1623(a) is unconstitutional. ECF 26 at 163.[1] But no court has rejected the argument either. That's because for decades the federal government declined to enforce section 1623(a). Only in the past year has it unleashed a flurry of lawsuits asserting the same section 1623(a) preemption challenge to other states' laws that it asserts in this action. All but one of those lawsuits remains pending. *United States v. Texas*, No. 25-10898 (5th Cir.); *United States v. Newsom*, No. 2:25-cv-03375-TLN-JDP (E.D. Cal.); *United States v. Beshear*, No. 3:25-cv-00028-GFVT (E.D. Ky.); *United States v. Walz*, No. 0:25-cv-02668-KMM-DTS (D. Minn.); *United States v. Virginia*, No. 3:25-cv-01067-REP (E.D. Va.).[2]

Section 1623(a) impermissibly instructs the states that they must not make undocumented students eligible for higher education benefits unless they satisfy the federal government's conditions. By contrast, the statute does not regulate undocumented students in any way: it does not forbid them to accept those prohibited higher education benefits or punish them if they do. Try as the federal government might, "there is simply no way to understand [section 1623(a)] as anything other than a direct command to the States. And that is exactly what the anticommandeering rule does not allow." *Murphy v. NCAA*, 584 U.S. 453, 480 (2018). All of the federal government's preemption claims against all defendants should be dismissed.

---

[1] Page numbers refer to the "PageID" printed by CM/ECF on the top right side of each page.

[2] Only the federal government's challenge to Oklahoma's law is final. *United States v. Oklahoma*, No. 25-CV-265-RAW-DES, 2025 WL 2815662 (E.D. Okla. Aug. 7, 2025), *adopted by* 2025 WL 2815660 (E.D. Okla. Aug. 29, 2025). Oklahoma officials did not contest the claim but rather were "sympathetic to the[ ] cause" and "inclined to settle favorably and quickly" by agreeing to entry of a consent judgment. *Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179, 192 (2022). The result is "hobbled litigation rather than a full and fair adversarial testing of the State's interests and arguments." *Id.*

## RESPONSE TO STATEMENT OF MATERIAL FACTS

Almost all the federal government's "material facts" fail to satisfy the requirements of Local Rule 56.1(a) because they comprise legal conclusions (or at most "legislative facts" that are not unique to this litigation). Generally, the federal government's statement of material facts asserts the existence of Illinois laws, summarizes their plain language, and contends that the laws should be interpreted in certain ways or have particular consequences. A statement of material facts that contains this sort of material does not serve the purpose of the document: to help the Court determine whether there is any "genuine dispute as to any material fact" that would preclude "judgment as a matter of law." Fed. R. Civ. P. 56(a) & (c)(1)(A); *see, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial"); *Indiana Harbor Belt Railroad v. American Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990) ("trials are to determine adjudicative facts rather than legislative facts"); *Illinois Association of Firearms Retailers v. Chicago*, 961 F. Supp. 2d 928, 932 (N.D. Ill. 2014) (only disputes concerning material *adjudicative* facts preclude entry of summary judgment). Further, the parties stipulated that the "claims in this action present questions of law," ECF 23 at 131, ¶ 3, and the Court should hold the parties to their agreement, *e.g.*, *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1206 (7th Cir. 1989). Nevertheless, in an abundance of caution, defendants respond to the federal government's statement of material facts as required under Local Rule 56.1(b):

1.     Defendants admit that Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996.

2.     Defendants admit that IIRIRA included what is now codified at 8 U.S.C. § 1623.

3.     Defendants admit that section 1623(a) provides: "Notwithstanding any other

provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident."

4.      Defendants admit that article V, section 8 of the Illinois constitution provides: "The Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws."

5.      Defendants admit that article V, section 15 of the Illinois constitution provides: "The Attorney General shall be the legal officer of the State, and shall have the duties and powers that may be prescribed by law."

6.      Defendants admit that Illinois law authorizes the boards of trustees of Southern Illinois University, Rend Lake College, University of Illinois, Chicago State University, Eastern Illinois University, Illinois State University, and Northeastern Illinois University to establish tuition rates for Illinois residents.

7.      Defendants admit that Illinois Student Assistance Commission ("ISAC") is a state entity created by state statute to assist Illinois students in realizing their postsecondary educational goals and administer programs for monetary assistance for students.

8.      Defendants admit that the Illinois DREAM Fund Commission is a state entity charged with establishing a not-for-profit entity for fundraising, training, and awarding scholarships; raising funds for the DREAM Fund; and selecting recipients of scholarships funded by the DREAM Fund.

9.      Defendants admit that Illinois Public Act 93-7 ("2003 Act"), sometimes referred to as the "Acevedo Bill," was approved by the Governor on May 20, 2003, and provides eligible

4

students with access to in-state tuition at the state's public colleges and universities.

10.    Defendants admit that the 2003 Act includes provisions that were codified at 110 ILCS 305/7e-5(a), 110 ILCS 520/8d-5(a), 110 ILCS 660/5-88(a), 110 ILCS 665-10/88(a), 110 ILCS 675/20-88(a), 110 ILCS 680/25-88(a), and 110 ILCS 805/6-4a(a).

11.    Defendants deny that the 2003 Act provides that students who are not citizens or lawful permanent residents of the United States can establish Illinois residency for tuition purposes by meeting the residency requirements of the Act.

12.    Defendants admit that aliens who are not lawfully present in the United States can be eligible for in-state tuition at the State's public colleges and universities if they meet the requirements of the 2003 Act.

13.    Defendants admit that the provisions of the 2003 Act currently in effect and codified at 110 ILCS 305/7e-5(a) provide that an alien who is not lawfully present in the United States may be eligible for in-state tuition if: "(1) The individual resided with his or her parent or guardian while attending a public or private high school in this State. (2) The individual graduated from a public or private high school or received the equivalent of a high school diploma in this State. (3) The individual attended school in this State for at least 3 years as of the date the individual graduated from high school or received the equivalent of a high school diploma. (4) The individual registers as an entering student in the University not earlier than the 2003 fall semester. (5) In the case of an individual who is not a citizen or a permanent resident of the United States, the individual provides the University with an affidavit stating that the individual will file an application to become a permanent resident of the United States at the earliest opportunity the individual is eligible to do so."

14.    Defendants admit that the provisions of the 2003 Act currently in effect and

codified at 110 ILCS 520/8d-5(a), 110 ILCS 660/5-88(a), 110 ILCS 665-10/88(a), 110 ILCS 675/20-88(a), 110 ILCS 680/25-88(a), and 110 ILCS 805/6-4a(a) are materially identical to the provisions of the 2003 Act currently in effect and codified at 110 ILCS 305/7e-5(a).

15.     Defendants deny that, pursuant to the 2003 Act, an individual who is not lawfully present in the United States and establishes Illinois residency by meeting statutory criteria pays the same tuition rate as other Illinois residents. Defendants admit that the 2003 Act does not afford benefits to American citizens and nationals who are residents of other states.

16.     Defendants admit that the provisions of the 2003 Act currently in effect were amended in 2024.

17.     Defendants admit that Illinois Public Act 103-876 ("2024 Act") was approved by the Governor on August 9, 2023.

18.     Defendants admit that the provisions of the 2024 Act that will become effective on July 1, 2026, and are codified at 110 ILCS 305/7e-5(a-5)(1) provide that an alien who is not lawfully present in the United States may be eligible for in-state tuition if: "The individual: (A) attended a public or private high school in this State for at least 2 years before enrolling at the University; (B) graduated from a public or private high school in this State or received the equivalent of a high school diploma in this State; (C) attended high school while residing in this State and has not established residency outside of this State before enrolling at the University; and (D) agrees to swear and affirm to the University that the individual will file an application to become a permanent resident of the United States at the earliest opportunity if the individual is eligible to do so and is not a citizen or lawful permanent resident of the United States."

19.     Defendants admit that the provisions of the 2024 Act that will become effective on July 1, 2026, and are codified at 110 ILCS 305/7e-5(a-5)(2) provide that an alien who is not

lawfully present in the United States may be eligible for in-state tuition if she: "(A) attended any of the following for at least 2 years and attended for a cumulative total of at least 3 years before enrolling at the University: (i) a public or private high school in this State; (ii) a public community college in a community college district organized under the Public Community College Act; or (iii) a combination of those educational institutions set forth in subdivisions (i) and (ii) of this subparagraph (A); (B) has at the time of enrollment: (i) graduated from a public or private high school in this State or received the equivalent of a high school diploma in this State; and (ii) earned an associate degree from or completed at least 60 credit hours of graded, transferable coursework at a public community college in a community college district organized under the Public Community College Act; (C) attended an educational institution set forth in subdivision (i) or (ii) of subparagraph (A) of this paragraph (2) while residing in this State and has not established residency outside of this State before enrolling at the University; and (D) agrees to swear and affirm to the University that the individual will file an application to become a permanent resident of the United States at the earliest opportunity if the individual is eligible to do so and is not a citizen or lawful permanent resident of the United States."

20.    Defendants deny that the 2024 Act, like the 2003 Act before it, allows an alien who is not lawfully present in the United States to qualify for in-state tuition by establishing Illinois residency.

21.    Defendants admit that Illinois Public Act 101-21, also known as the Retention of Illinois Students and Equity Act ("RISE Act"), was approved by the Governor on June 21, 2019; became effective on January 1, 2020; and is now codified at 110 ILCS 986. Defendants further admit that the RISE Act defines "Illinois resident" as "any person who is deemed an Illinois resident for tuition purposes under State law," 110 ILCS 986/10, and provides that "a student

who is an Illinois resident (i) is eligible to apply or receive consideration for any student aid or

benefit funded or administered by the State or any State agency, offered by a unit of local

government, or administered by any public institution of higher learning, including, but not

limited to, scholarships, grants, awards, stipends, room and board assistance, tuition waivers, or

other financial or in-kind assistance and (ii) to ensure equity, success, and the retention of Illinois

residents, may not be subject to any caps on grant assistance available under the Monetary Award

Program other than those required by State law," *id.* 15(b).

22.    Defendants admit that Illinois Public Act 104-164 was approved by the Governor

on August 15, 2025; became effective on January 1, 2026; and amends 110 ILCS 986/15(b) to

include student aid and benefits funded or administered by units of local government.

23.    Defendants admit that Illinois Public Act 97-233 was approved by the Governor

on August 1, 2011; that it requires the Illinois Student Assistance Commission to establish the

Illinois DREAM Fund Commission and the Illinois DREAM Fund to provide scholarships that,

at the time of enactment, were to be funded entirely from private contributions; and that, to

receive a scholarship under this statute, "a student must meet all of the following qualifications:

(1) Have resided with his or her parents or guardian while attending a public or private high

school in this State. (2) Have graduated from a public or private high school or received the

equivalent of a high school diploma in this State. (3) Have attended school in this State for at

least 3 years as of the date he or she graduated from high school or received the equivalent of a

high school diploma. (4) Have at least one parent who immigrated to the United States." 110

ILCS 947/67(c). The cited source does not support the federal government's assertion that:

"Eventually, the Illinois DREAM Fund Commission further limited the statutory eligibility

requirements to 'undocumented students' in Illinois."

24.     Defendants admit that Southern Illinois University, Rend Lake College, University of Illinois, Chicago State University, Eastern Illinois University, Illinois State University, and Northeastern Illinois University offer tuition rates for Illinois residents and that aliens who are not lawfully present in the United States are eligible for those rates if they satisfy the requirements of 110 ILCS 305/7e-5(a) & (a-5), 110 ILCS 520/8d-5(a) & (a-5), 110 ILCS 660/5-88(a) & (a-5), 110 ILCS 665-10/88(a) & (a-5), 110 ILCS 675/20-88(a) & (a-5), 110 ILCS 680/25-88(a) & (a-5), and 110 ILCS 805/6-4a(a), as applicable.

25.     Defendants object to paragraph 25 of the federal government's statement of material facts under Local Rule 56.1(i). The only source cited for this proposition is the federal government's complaint. But "a court may consider only admissible evidence in assessing a motion for summary judgment," *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see* Fed. R. Civ. P. 56(c)(1)(A), and bare allegations are not admissible evidence, *e.g.*, *MCM Management Corp. v. Hudson Insurance Co.*, 645 F. Supp. 3d 866, 869 n.2 (N.D. Ill. 2022).

26.     Defendants admit that ISAC offers Illinois residents a variety of grant and scholarship programs, eligibility for which is based on factors such as financial need, academic achievement, chosen field of study, or military service; that the cornerstone of these programs is ISAC's need-based Monetary Award Program ("MAP"); that, each year, MAP awards over $400 million in grants to approximately 145,000 undergraduates who demonstrate a financial need for such assistance; and that grants awarded through MAP cover tuition and mandatory fees.

27.     Defendants admit that some programs offered by ISAC are targeted in nature; that they range in focus from those that recognize academic achievement or a chosen field of study or profession to those that reward military service; and that, collectively, these targeted scholarship and grant programs award millions in gift aid to qualified applicants each year.

28.     Defendants admit that Illinois has created a separate financial aid application called the Alternative Application for Illinois Financial Aid ("Alternative Application"), which enables aliens who are not lawfully present in the United States to apply for the Illinois MAP grants, the State's largest need-based grant program for low-income college students; that the Alternative Application is accessible through the ISAC website; and that it does not apply to American citizens.

29.     Defendants admit that MAP grants are administered by Illinois universities based on the eligibility criteria established by ISAC and that MAP funding is typically insufficient to meet the demand.

30.     Defendants admit that DREAM Fund scholarships are separately administered by the Illinois DREAM Fund Commission and that, beginning in 2024, money to support the fund is raised, in part, through Illinois Lottery scratch-off tickets. The cited source does not support the federal government's assertion that the Illinois DREAM Fund Commission further "limits [ ] scholarships to 'undocumented students.'"

31.     Defendants admit that the Community Foundation of Northern Illinois offers scholarships based on the recipient's residence in certain Illinois counties.

32.     Defendants admit that, for the year 2022, approximately 408,000 aliens not lawfully present were enrolled as students in American institutions of higher education, including approximately 27,000 such students in Illinois.

## ARGUMENT

## I.     The challenged Illinois laws comply with section 1623(a).

The federal government first asks the Court to decide whether the plain language of section 1623(a) expressly preempts the challenged Illinois laws. ECF 26 at 154-61. The Court

need not do so, at least not right now, for two reasons. *First*, as explained in defendants' motion
to dismiss, ECF 18 at 120-26, and below, section 1623(a) is not a valid preemption provision and
therefore does not preempt any laws. *Second*, the Illinois legislature is currently considering a
significant amendment to the challenged laws.[3] Of course, "the general rule" is that a "significant
amendment to challenged legislation ends the ongoing controversy and renders moot a plaintiff's
request for injunctive relief." *Federation of Advertising Industry Representatives v. Chicago*, 326
F.3d 924, 930 (7th Cir. 2003). What's more, if the proposed legislation is enacted and becomes
law, it may resolve the federal government's preemption concerns. *See Martinez v. Regents of the
University of California*, 241 P.3d 855, 862-72 (Cal. 2010) (holding that a materially identical
state law complies with section 1623(a)). If, on the other hand, the federal government wishes to
continue waging its preemption fight, it may choose to do so at that time.

Regardless, the arguments currently before the Court fail on the merits. Section 1623(a)
forbids the states to make "an alien who is not lawfully present in the United States" eligible for
postsecondary education benefits "on the basis of *residence* within a State" (emphasis added).
Congress defined the word "residence" in section 1623(a) to "mean[ ] the place of general abode;
the place of general abode of a person means his principal, actual dwelling place in fact, *without
regard to intent*." 8 U.S.C. § 1101(a)(33) (emphasis added). Contrast this statutory definition of
"residence" with the ordinary meaning of "domicile," which requires "physical presence in a
state, *with intent to remain there*." *Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996)
(emphasis added); *see Anwo v. INS*, 607 F.2d 435, 437 n.2 (D.C. Cir. 1979) (distinguishing
section 1101(a)(33)'s definition of "residence" from the ordinary meaning of "domicile"). For

---

[3] Illinois House Bill 5093, 104th General Assembly, available at https://www.ilga.gov/Legislation/
BillStatus?DocTypeID=HB&DocNum=5093&GAID=18&SessionID=114&LegID=166637.

purposes of section 1623(a), therefore, "residence" and "domicile" are two separate concepts.

The challenged state laws do not fall within section 1623(a)'s grasp because they make undocumented students eligible for postsecondary education benefits on the basis of *domicile* in Illinois rather than *residence*. To be sure, those laws refer to residence. *E.g.*, 110 ILCS 305/7e-5(a-5)(1)(C) (student "shall be charged tuition . . . at the same rate as an Illinois resident if" she "attended high school while residing in this State and has not established residency outside of this State before enrolling at the University"). But, as the Illinois Supreme Court has explained, references to "residence" in an Illinois statute generally are interpreted to mean "domicile." *E.g.*, *Fagiano v. Police Board of the City of Chicago*, 456 N.E.2d 27, 29-30, 98 Ill. 2d 277, 283 (1983). And a student's eligibility for in-state tuition is particularly likely to be based on domicile. *E.g.*, University of Illinois System Residency Status Policy[4] ("A student may qualify as an Illinois resident due to residency based on bona fide domicile in Illinois."); *see Vlandis v. Kline*, 412 U.S. 441, 453-54 (1973) (states can satisfy constitutional due process requirements if they use domicile as a "reasonable criteria" to determine eligibility for in-state tuition).

Even if a state law makes "an alien who is not lawfully present in the United States" eligible for postsecondary education benefits "on the basis of *residence* within a State," the law does not run afoul of section 1623(a) if it also makes "*a* citizen or national of the United States" eligible for the same benefit "without regard to whether the citizen or national is such a resident" (emphasis added). And the challenged state laws do precisely this. Consider a hypothetical American citizen who was born in Illinois (and thus acquires a domicile here). *See, e.g.*, *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). She continues to live in Illinois (and thus retains her Illinois domicile) until she graduates from an Illinois high school

---

[4] Available at uaps.uillinois.edu/student_programs/residency_information/residency_status_requirements.

and moves to Missouri temporarily for the sole purpose of attending college.

At this point, our student's residence and domicile diverge: Under section 1101(a)(33)'s definition, her "residence" is in Missouri because that is her "actual dwelling place in fact" and her "intent to remain" is irrelevant. But her "domicile" is still in Illinois because here, intent to remain *is* relevant: the domicile a person acquires at birth "continues until a new one . . . is acquired" by moving to another state with the "intent to remain there." *Mississippi Band*, 490 U.S. at 48. And "[c]ourts have consistently recognized that out-of-state college students are temporary residents and not domiciliaries of the states in which they attend college." *Hakkila v. Consolidated Edison Company of New York, Inc.*, 745 F. Supp. 988, 990 (S.D.N.Y. 1990).

Now, suppose that our hypothetical student applies to graduate schools during her senior year at her Missouri college—and decides to enroll at an Illinois public university. She is a Missouri resident under section 1623(a) who nevertheless is eligible for in-state tuition and scholarships under the challenged state laws because she attended high school while domiciled in Illinois and remains domiciled in Illinois even while residing in Missouri to attend college. *See, e.g.*, 110 ILCS 305/7e-5(a-5)(1)(C). In other words, she is "*a* citizen or national of the United States" who is eligible for the same benefits as undocumented students "without regard to whether" she is "a resident" of Illinois. 8 U.S.C. § 1623(a) (emphasis added). It follows that the challenged state laws comply with section 1623(a)'s mandate and therefore are not preempted.

## II.    Section 1623(a) violates the anticommandeering doctrine.

On top of this, section 1623(a) is not a valid preemption provision: it violates the anticommandeering doctrine by regulating states rather than private actors. In the alternative, even if section 1623(a) regulates private actors (it doesn't), the statute still violates the anticommandeering doctrine: it issues a direct order to the states instructing them on what they

must do if *they* wish to regulate private actors.

### A.    Section 1623(a) regulates states rather than private actors.

Everyone agrees that a federal law "must satisfy two requirements" to "preempt state law": It must (1) "represent the exercise of a power conferred on Congress by the Constitution" and (2) "regulate[ ] private actors." *Murphy*, 584 U.S. at 477; *see* ECF 26 at 167 ("it is apparent that" a federal law may violate the anticommandeering doctrine if it "fails to regulate private parties").[5] And no one disputes "that section 1623(a) 'represent[s] the exercise of a power conferred on Congress by the Constitution' and therefore satisfies [the] first requirement to be a valid statute that 'preempt[s] state law.'" ECF 18 at 120-21. So that leaves one question: does section 1623(a) regulate private actors?

### 1.    Section 1623(a) does not regulate American citizens.

The first possibility can quickly be ruled out. The federal government halfheartedly submits that section 1623(a) regulates "U.S. citizens and nationals" because it requires the states to provide them postsecondary education benefits under certain circumstances. ECF 26 at 169. That's incorrect for two reasons, neither of which the federal government acknowledges (much less refutes) in the one conclusory sentence that it spares for this position. *See, e.g.*, *Sykes v. Cook Inc.*, 72 F.4th 195, 210 n.7 (7th Cir. 2023) ("'one sentence observation without argument [is] undeveloped and thus waived'"). *First*, as explained, *see* ECF 18 at 123, every court to consider the question has held that section 1623(a) does *not* require the states to provide benefits to American citizens, *see Young Conservatives of Texas Foundation v. Smatresk*, 73 F.4th 304, 313 (5th Cir. 2023); *Day v. Bond*, 500 F.3d 1127, 1139 (10th Cir. 2007).

---

[5] It's true that applying the anticommandeering doctrine to section 1623(a) "would promote individual liberty and political accountability," but, despite the federal government's accusation, no one is suggesting that this is a separate "prong of the *Murphy* test." ECF 26 at 168.

*Second*, which of Congress's enumerated powers would authorize it to require that the states provide postsecondary education benefits to *American citizens*? Certainly not "Congress's plenary *immigration* power," which is the sole source of authority for section 1623(a) that the federal government identifies anywhere in its filing. ECF 26 at 167 (emphasis added). Federal laws concerning education are usually enacted pursuant to the spending clause and are "'in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Davis v. Monroe County Board of Education*, 526 U.S. 629, 639-40 (1999). But the federal government hasn't shown that section 1623(a) is spending clause legislation (or that it complies with requirements imposed on spending clause legislation). *See id.*

### 2. Section 1623(a) does not regulate private foundations.

Turn next to the federal government's suggestion that section 1623(a) regulates the Community Foundation of Northern Illinois and other private foundations that offer "private scholarships" to college students. ECF 26 at 171. It can scarcely be called an argument because this is all that the federal government has to say about it: section 1623(a) regulates private foundations, it asserts, because "it is not difficult to find private scholarships available on the basis of residence," and this "alone refutes Illinois' claim that Section 1623 solely regulates the states." *Id.* But this is illogical: the mere fact that *something happens* does not mean that a federal law *encompasses* it. It's like insisting that 42 U.S.C. § 1983 must apply to the states because they sometimes "subject[ ]" people "to the deprivation of [ ] rights, privileges, or immunities secured by the Constitution and laws." To the contrary, of course, the plain language of section 1983 limits its application only to a "person" who engages in that activity, and the common usage of that term (along with other statutory interpretation tools) establishes that a state isn't a person and therefore is excluded from section 1983's coverage. *Will v. Michigan*

*Department of State Police*, 491 U.S. 58, 64-65 (1989).

The federal government says nothing about why it thinks that the plain language of section 1623(a) encompasses private foundations offering private scholarships. The statute is ambiguous because it is written in the passive voice: It provides that "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit." It does not, however, identify *who* must refrain from making "alien[s]" eligible for benefits. *See, e.g.*, *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287, 298 (7th Cir. 1992) ("By writing its statute in the passive voice—banning an outcome while not saying *who* the actor is, or *how* such actors bring about the forbidden consequence—Congress created ambiguity.").

One clue comes from the ordinary public meaning of the phrase "education benefit." *See, e.g.*, *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020) ("[Supreme] Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment"). The phrase "education benefit" is often used to refer specifically to *public* benefits provided by a *government*. *E.g.*, *Rudisill v. McDonough*, 601 U.S. 294, 299 (2024) ("GI bills from the Korean War onward have provided education benefits to fully qualified servicemembers for a fixed duration."); *Yellen v. Confederated Tribes of Chehalis Reservation*, 594 U.S. 338, 344 (2021) (tribe "delivers federally funded . . . education benefits to the tribe's membership").

Another clue is the title of the subchapter where section 1623(a) is found. The Supreme "Court has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Dubin v. United States*, 599 U.S. 110, 120-21 (2023) (cleaned up); *see* ECF 26 at 168 (federal government conceding that section 1623(a)'s title sheds light on what "Congress sought"). "Where the mind labors to

16

discover the design of the legislature, it seizes every thing from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration." *United States v. Fisher*, 6 U.S. 358, 386 (1805) (Marshall, J.); *see Ellingburg v. United States*, No. 24-482, 2026 WL 135982, at *2 (U.S. Jan. 20, 2026) (relying on titles to discern statutory meaning).

Section 1623(a) is one of just five provisions that comprise subchapter II of chapter 14 of title 8 of the United States Code. Subchapter II is titled: "Eligibility for *state and local public benefits* programs" (emphasis added). This is strong evidence that section 1623(a) is limited to benefits provided by state and local governments. Thus, the "who" that Congress had in mind when it enacted section 1623(a) are the state and local governments that, of course, are the only entities that can make anyone eligible for state and local benefits. *See, e.g.*, *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("The placement of § 1146(a) within a subchapter expressly limited to postconfirmation matters undermines Piccadilly's view that § 1146(a) covers preconfirmation transfers."); *A.R.M.R. v. United States*, No. 24-cv-2416-DWD, 2025 WL 3485705, at *12 (S.D. Ill. Dec. 4, 2025) (Dugan, J.) (provision's location in "'Quarantine and Inspection' subchapter" "indicates Congress viewed [provision] as a form of quarantine power"); *see also* Public Law 104-208, § 505 (enacting section 1623 under subtitle "Eligibility of Aliens for *Public* Assistance and Benefits") (emphasis added).

What's more, the plain language of every other provision in subchapter II applies *only* to state or local benefits. *See* 8 U.S.C. § 1621 ("Aliens who are not qualified aliens or nonimmigrants ineligible for State and local public benefits."); *id.* § 1622 ("State authority to limit eligibility of qualified aliens for State public benefits."); *id.* § 1624 ("Authority of States and political subdivisions of States to limit assistance to aliens and to distinguish among classes of aliens in providing general cash public assistance."); *id.* § 1625 ("Authorization for

17

verification of eligibility for State and local public benefits."). Section 1623(a) is sandwiched right in the middle of these provisions limited to state or local benefits. And when "several items in a list share an attribute," it "counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994); *see, e.g.*, *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 856 (7th Cir. 2002) ("'each part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole'" and therefore "'it is not proper to confine interpretation to the one section to be construed'"); *Providence v. Barr*, 954 F.3d 23, 41 (1st Cir. 2020) ("we are hesitant to interpret the sixth and final subsection to grant wide-ranging substantive authority" where other subsections "encompass purely ministerial responsibilities"); *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Service*, 220 F. Supp. 3d 27, 31 (D.D.C. 2016) ("If a word may be known by the company it keeps under the *noscitur a sociis* interpretive maxim, then surely so may a statutory provision.") (cleaned up).

So, while section 1623(a) does not specify *who* is forbidden to make "alien[s]" eligible for postsecondary education benefits, "the answer" to that question "lie[s] in considering the paragraph's text in its legal context." *Pulsifer v. United States*, 601 U.S. 124, 141 (2024); *see* ECF 26 at 169 (federal government agreeing that immigration laws should be read "as a whole").[6] And the context is clear: section 1623(a), consistent with ordinary meaning, the subchapter's title, and neighboring provisions, applies only to *state and local* benefits. It follows that section 1623(a) does not regulate private foundations providing private scholarships. *Accord*

---

[6] The federal government also agrees that section 1623(a) "[b]uild[s] on [the] principles of national immigration policy" set forth in 8 U.S.C. § 1601(2) and (6): that "'the availability of *public* benefits [should] not constitute an incentive for immigration to the United States' and that '[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of *public* benefits.'" ECF 26 at 163 (emphasis added).

*Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring) ("common sense" dictates that "a statute imposing criminal penalties on 'whoever drew blood in the streets'" does not "cover a surgeon" performing a medical procedure "because in the context of the criminal code, a reasonable observer would expect the term drew blood to describe a violent act") (cleaned up).

### 3.    Section 1623(a) does not regulate aliens.

This leaves one remaining category of private actors who might be regulated by section 1623(a): the "alien[s]" who the statute says "shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit." We know from *Murphy* that a federal law regulates private actors when it "imposes restrictions or confers rights on" them. 584 U.S. at 477. But section 1623(a) certainly doesn't confer any rights on aliens. And it doesn't impose any restrictions on them either. It doesn't limit what an alien may or may not do. It doesn't say, for instance: "An alien who is not lawfully present in the United States shall not accept any postsecondary education benefit." Nor does section 1623(a) impose any penalties on aliens. It doesn't say, for instance: "An alien who accepts a postsecondary education benefit may be imprisoned or ordered to pay a fine." Simply put, there's no action an alien could take (or refrain from taking) that would cause *the alien* to violate section 1623(a).

*Murphy* confirms this conclusion by providing concrete examples. A federal law might regulate private actors, the Supreme Court reasoned, if the law could "be violated" by the private actor's conduct. 584 U.S. at 480. And a federal law might regulate private actors if a violation provides "ground[s] for a civil action by the Attorney General or any other party" against the private actor. *Id.* But section 1623(a) "would not be violated" if an "alien" were to accept a benefit that runs afoul of its prohibition. And an alien's accepting such a benefit would not give rise to "any ground for a civil action" against the alien.

The federal government's only response is that section 1623(a) necessarily regulates "alien[s]" because it ultimately affects them. *E.g.*, ECF 26 at 169. But almost all laws ultimately affect private actors, so this argument would swallow the anticommandeering doctrine whole. Take the federal law prohibiting state authorization of sports gambling that the Supreme Court found unconstitutional under the anticommandeering doctrine in *Murphy*.[7] It too ultimately affected private actors: people who would have liked to gamble on sports and were unable to do so. But, the Supreme Court explained, this did not mean that those private actors were *regulated* by the law. 584 U.S. at 480. A federal law regulates private actors if it imposes restrictions on *them*, not if it imposes restrictions on *others* that ultimately affect them. *Id.*

For a closely related reason, the federal government is correct that a federal law does not run afoul of the anticommandeering doctrine simply because it "has the practical effect of telling a State that it may not do something." ECF 26 at 171-72. The Airline Deregulation Act, for example, "confers on [certain air carriers] a federal right to engage in certain conduct subject only to certain (federal) constraints," which necessarily means that states cannot impose their own additional restrictions on those carriers. *Murphy*, 584 U.S. at 478-79. But there's no anticommandeering problem because the federal law regulates private actors by conferring rights on them. *Id.* Thus, it does not impermissibly issue any direct orders to the states. *Id.*

These are really two sides of the same coin: asking whether a federal law ultimately affects states is just as meaningless to an anticommandeering analysis as asking whether the law ultimately affects private actors. The answer to both questions is almost always "yes," which is

---

[7] The federal government thinks it is relevant to *Murphy*'s anticommandeering analysis that "gambling is traditionally regulated by the states." ECF 26 at 166. Not so: "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York v. United States*, 505 U.S. 144, 168 (1992). Anyway, "education" is also an area "where States historically have been sovereign." *United States v. Lopez*, 514 U.S. 549, 564 (1995).

no help at all. The relevant inquiry, by contrast, is binary: Start by asking whether the law *regulates* private actors by imposing restrictions or conferring rights *on them*. If so, the law is a valid preemption provision. If not, the law is unconstitutional. *Murphy*, 584 U.S. at 479-80.

As explained, section 1623(a) does not impose restrictions or confer rights on "alien[s]"—or any other private actor. This is reason alone to find that the statute is not a valid preemption provision and to reject the federal government's preemption claims. *Murphy*, 584 U.S. at 479 ("every form of preemption is based on a federal law that regulates the conduct of private actors"). But it helps to consider why it follows from this conclusion that section 1623(a) must therefore regulate the states in violation of the anticommandeering doctrine. Recall that, under the statute, an "alien" "shall not be eligible" for certain "postsecondary education benefit[s]" provided by states. Aliens, of course, do not decide who is eligible for postsecondary education benefits; it is state legislatures that make those decisions by enacting laws like the ones the federal government challenges here. *See, e.g.*, ECF 26 at 173 (federal government conceding "that Illinois law confers such eligibility"). So, when Congress says aliens "shall not be eligible" for those benefits, the object of its command must be state legislatures rather than aliens. What it really means is "don't enact laws making aliens eligible for those benefits." In other words, Congress has "unequivocally dictate[d] what a state legislature may and may not do"—and "[a] more direct affront to state sovereignty is not easy to imagine." *Murphy*, 584 U.S. at 474.

The federal government seems to think that this is all just semantics. But there is a real difference between section 1623(a) as enacted and section 1623(a) as it might have been drafted to avoid commandeering the states. This litigation illustrates the problem. Plainly, the federal government wants undocumented students to pay full price at state universities (which may prevent them from attending those universities altogether). The federal government's solution is

not to pursue remedies against those undocumented students, however, but rather to obtain an injunction that ties the state's hands. If the federal government is successful, an undocumented student who approaches Illinois universities to inquire about in-state tuition or scholarships will be told, "Sorry, *we* can't do that." And future Illinois legislatures, seeing the writing on the wall, may simply exclude undocumented students from any laws that they enact creating new postsecondary education benefits. As a practical matter, the onus of the federal government's policy preference will fall not on itself but rather on the state. *See Printz v. United States*, 521 U.S. 898, 928, 930 (1997) (state officials are "put in the position of taking the blame for" the federal law's "burdensomeness and for its defects" when the federal government makes them "'puppets of a ventriloquist Congress'").

Suppose that section 1623(a) said instead: "An unlawfully present alien who accepts a prohibited postsecondary education benefit may be imprisoned or ordered to pay a fine." Then the federal government could impose its policy preference only by enforcing the statute in its own name—say by storming college campuses and rounding up undocumented students whom it suspects are paying in-state tuition. Even this administration might hesitate to incur those costs. *E.g.*, *López Belloza v. Hyde*, No. 25-13499-RGS, 2026 WL 125168, at *1 (D. Mass. Jan. 16, 2026) (federal government "apologized" to "an innocent and unsuspecting teenage college student" who was "swept up" by immigration agents as she traveled home "for what it agrees was a tragic (and preventable) mistake"). After all, many people think it is unjust to punish undocumented students for their parents' actions, *e.g.*, *Department of Homeland Security*, 591 U.S. at 29; *Plyler*, 457 U.S. at 221, and would be horrified to see immigration agents handcuffing young people on the Main Quad in Urbana or at the Student Center in Carbondale simply for the "sin" of trying to obtain an education. But at least under this hypothetical version of the statute

22

"the responsibility for" those actions would be "apparent. Voters who like or dislike the effects of the regulation [would] know who to credit or blame." *Murphy*, 584 U.S. at 473. Perhaps that is precisely what Congress was trying to avoid when it enacted the "real" section 1623(a).[8]

The point of drawing this comparison is not, as the federal government charges, "to smuggle" the state's "preferred equities into a test about statutory interpretation." ECF 26 at 174. It is, rather, to demonstrate that "the accountability of both state and federal officials is diminished" when "the Federal Government compels States to regulate." *New York*, 505 U.S. at 168. This is no small matter: among "the Constitution's structural protections of liberty" is its resolve "that a State's government will represent and remain accountable to its own citizens," *Printz*, 521 U.S. at 919-21, and that "'a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front,'" *New York*, 505 U.S. at 181. Understanding why section 1623(a) runs headlong into this constitutional design, and what Congress might have done instead to implement its policy preference, simply confirms what a straightforward application of the anticommandeering doctrine has already established: section 1623(a) is unconstitutional.[9]

### B.    Even if section 1623(a) regulates private actors, it still violates the anticommandeering doctrine because it also issues a direct order to states.

It's plain that section 1623(a) does *not* regulate private actors for all the reasons just

---

[8] As this hypothetical illustrates, the federal government is wrong to fear that "Congress's ability to regulate would be destroyed" if the anticommandeering doctrine is applied to section 1623(a). ECF 26 at 170. Congress *can* regulate; it simply must regulate *private actors* rather than states. Yes, this may affect Congress's *willingness* to regulate, but that is a feature of the anticommandeering doctrine, not a bug.

[9] The federal government devotes almost a page to cases addressing whether a separate immigration provision, 8 U.S.C. § 1373, unconstitutionally commandeers the states. ECF 26 at 170 & n.4. But then it abruptly backtracks and insists that section 1373 is "irrelevant" to the Court's analysis here. *Id.* at 171. For whatever it may be worth, the Seventh Circuit is currently considering the question of section 1373's constitutionality. Appellant's Brief at 51-66, *United States v. Illinois*, No. 25-2904 (7th Cir. Jan. 22, 2026).

explained. But, in the alternative, the statute still would violate the anticommandeering doctrine even if it *did* regulate private actors. That's because it also issues a direct order to the states instructing them on what they must do if they wish to regulate private actors. Just as Congress "may not direct the states to *use* their legislative powers to regulate private conduct," *Travis v. Reno*, 163 F.3d 1000, 1003 (7th Cir. 1998) (emphasis added), so too Congress may not direct the states on *how* to use their legislative powers *if they choose* to regulate private conduct, *see New York*, 505 U.S. at 162 ("the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions").

It's true, as the federal government observes in response, that federal laws "'typically'" do not "'implicate the Tenth Amendment'" if they "'appl[y] "evenhandedly" to state and private actors.'" ECF 26 at 173. The key word is "evenhandedly," which gains clarity from three Supreme Court cases developing the principle. *South Carolina v. Baker*, 485 U.S. 505, 511 (1988), concerned a law regulating the issuance of unregistered bonds, which was done by states and private parties alike. *Reno v. Condon*, 528 U.S. 141, 146 (2000), concerned a law regulating the sale of drivers' personal information, which again was done by states and private parties alike. And *Haaland v. Brackeen*, 599 U.S. 255, 283-84 (2023), concerned a law regulating the filing of child welfare proceedings, which again was done by states and private parties alike.

What these federal laws have in common is exactly what the word "evenhandedly" would suggest: they regulate an activity in which both states and private parties engage, and in doing so they treat states and private parties alike in all material ways. But section 1623(a) does something else: it directs the states on how *they* must regulate private parties. If states wish to offer in-state tuition to undocumented students, Congress instructs them that they must also offer in-state tuition to American citizens from other states. This is not "evenhanded[ ] regulat[ion]

[of] an activity in which both States and private actors engage" but rather a direct order to the states that is forbidden by the anticommandeering doctrine. *Murphy*, 584 U.S. at 475-77.

The federal government cites *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264 (1981), for the proposition that, even so, section 1623(a) doesn't violate the anticommandeering doctrine because "it gives the States a choice." ECF 26 at 172. To be sure, "where Congress has the authority to regulate private activity under the Commerce Clause," the Supreme Court has occasionally "recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *New York*, 505 U.S. at 167 (citing the Clean Water Act and Occupational Safety and Health Act as examples). But section 1623(a)'s mandate to the states bears no resemblance to these instances of "cooperative federalism," which concern "statute[s] that comprehensively regulate[ ]" a particular field "and offer[ ] States the choice of 'either implement[ing]' the federal program 'or else yield[ing] to a federally administered regulatory program.'" *Murphy*, 584 U.S. at 476 (quoting *Hodel*, 452 U.S. at 289). So this line of authority provides no justification to ignore what is apparent on the face of section 1623(a): a direct order that states must provide postsecondary education benefits to American citizens if they choose to provide those same benefits to undocumented students.

## III.    The Court should craft fair and appropriate equitable relief.

The federal government is not entitled to any relief. But if the Court determines otherwise, it should issue an injunction that applies only to the specific laws that the federal government challenges in its complaint—and that is limited to what is necessary, fair, and workable given the extraordinary equities implicated by the federal government's claims.

### A.    Any injunction should apply only to the laws challenged in the complaint.

If the Court issues an injunction, it should be limited to enforcement of the specific laws challenged in the complaint. The federal government asks the Court also to enjoin enforcement of "any laws that are substantially similar in scope" (whether or not they currently exist). ECF 26 at 179. But there are multiple problems with this request. *First*, the phrase "substantially similar" laws is far too vague to satisfy the requirement of Federal Rule of Civil Procedure 65(d)(1)(C) that injunctions must "describe in reasonable detail" what is "restrained." *E.g.*, *McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015) (injunction "prohibiting 'any similar statements'" is "improper" because "'similar'" is too "vague"); *American Can Co. v. Mansukhani*, 742 F.2d 314, 333 (7th Cir. 1984) ("injunction against selling inks which are 'compositionally similar' to plaintiff's inks" "is too vague"); *see United States v. Apex Oil Co.*, 579 F.3d 734, 739 (7th Cir. 2009) ("We have insisted on strict compliance with [Rule 65(d)(1)(C)'s] requirements.").

Ultimately, the federal government's proposal to enjoin "any laws that are substantially similar in scope" is self-defeating. If the Court were to enter such an injunction, it would be "so unclear what [defendants would be] enjoined from doing that [they] could not be punished for violating [such an] injunction." *Dupuy v. Samuels*, 465 F.3d 757, 759 (7th Cir. 2006). And, "being unenforceable, [the injunction] would place no burden on [defendants]. [They] could thumb [their] nose[s] at it with impunity." *Id.* That would waste everyone's time and resources.

*Second*, the Court lacks jurisdiction to enjoin enforcement of laws that do not yet exist. The reason for this request, the federal government explains, is that it wishes to "avoid a situation in which new laws are promulgated with minor changes that fail to remedy the conflicts with and preemption by Section 1623." ECF 26 at 179. Set aside the fatal flaw in this logic: whether amendments to the challenged state laws would change the section 1623(a) preemption

26

analysis cannot possibly be determined before anyone knows what those changes are.

Regardless, "standing is not dispensed in gross," which means that the federal government "must demonstrate standing . . . for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). But enjoining enforcement of *future* laws would run afoul of "'the oldest and most consistent thread in the federal law of justiciability'": "federal courts will not give advisory opinions.'" *Flast v. Cohen*, 392 U.S. 83, 96 (1968); *see ATC Vancom of California, L.P. v. NLRB*, 370 F.3d 692, 697 (7th Cir. 2004) ("Individuals and entities are not entitled to binding advisory opinions from public agencies or courts that announce the proper operation of laws before they go into effect."); *Associated General Contractors of America v. Columbus*, 172 F.3d 411, 413 (6th Cir. 1999) (federal courts lack jurisdiction to issue "an advisory opinion as to the constitutionality of future legislative action"); *Villas at Parkside Partners v. Farmers Branch*, 577 F. Supp. 2d 880, 881 (N.D. Tex. 2008) (no Article III standing "to obtain an advisory opinion on the constitutionality of the ordinance before it went into effect").[10]

    *Third*, the federal government's request to enjoin enforcement of laws that it hasn't even identified to the Court, much less proven are preempted, is impossible to square with the basic equitable rules that "an injunction issues 'only as necessary to protect against otherwise irremediable harm,'" *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021), and that courts must "tailor injunctive relief to the scope of the violation found," *National Organization for Women, Inc. v. Scheidler*, 396 U.S. 807, 817 (7th Cir. 2005). The federal government has asserted specific legal challenges to specific Illinois laws. If the Court agrees with the federal

---

[10] For the same reason, the Court lacks jurisdiction to determine whether House Bill 5093's proposed amendments to the challenged Illinois laws comply with section 1623(a). "[T]he task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies *before the statute is put into effect*, is rarely if ever an appropriate task for the judiciary." *Younger v. Harris*, 401 U.S. 37, 52 (1971) (emphasis added). There will be time enough to consider those questions if, and after, the proposed amendments are enacted and become law.

government's claims, then it may enjoin enforcement of those laws—and those laws only.

**B.      Any injunction should be limited to what is necessary, fair, and workable.**

If the Court issues an injunction, it should exercise its equitable discretion to minimize the harm that necessarily will accrue by its enjoining enforcement of state laws that have been on the books for more than two decades and on which tens of thousands of promising young men and women who grew up in this state are currently relying to receive a college education. "Under [the Supreme Court's] well-established precedent, the equitable relief available in the federal courts is that 'traditionally accorded by courts of equity' at the time of our founding." *Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025). And it is "sound discretion" that has always "guide[d] the determinations of courts of equity." *Meredith v. Winter Haven*, 320 U.S. 228, 235 (1943). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). "Crafting 'fair' and 'appropriate' equitable relief necessitates the exercise of discretion—the hallmark of traditional equitable practice." *Starbucks Corporation v. McKinney*, 602 U.S. 339, 347 (2024).

Equity's defining "qualities of mercy and practicality" justify the Court's enjoining enforcement of the challenged state laws only as applied to *new* students. *Hecht*, 321 U.S. at 329; *see Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) ("equitable remedies are a special blend of what is necessary, what is fair, and what is workable"). In other words, the Court's injunction should ensure that undocumented students who are *currently* enrolled at Illinois colleges and universities may continue to receive all available postsecondary education benefits until they complete their degree. *Accord, e.g.*, 110 ILCS 520/15 (generally prohibiting tuition increases for current students). These students are neither morally nor legally culpable for organizing their

28

young lives around the promise of in-state tuition and scholarships that allow them to pursue

higher education. But a sophomore, say, who suddenly must pay more out of pocket to complete

the next two years of college may be forced to postpone her studies, transfer to another school

that may not offer the same opportunities, or perhaps even drop out altogether. Not only would

this disruption exact a severe individual injury on those affected students (whose potential may

never be realized); it would also impose a grave public injury with a ripple effect that may be felt

in every community across this state. *E.g.*, *Plyler*, 457 U.S. at 221 ("education has a fundamental

role in maintaining the fabric of our society" because it "provides the basic tools by which

individuals might lead economically productive lives to the benefit of us all"); *see Department of

Homeland Security*, 591 U.S. at 29 (undocumented students are typically "'productive young

people' who were brought here as children and 'know only this country as home'").

In any event, the Court should also ensure that affected institutions and students have

sufficient time to prepare for implementation of the new rates that may be required by an

injunction precluding enforcement of the challenged laws. Illinois colleges and universities

typically establish tuition rates many months before the academic year begins: the Board of

Trustees of the University of Illinois, for example, has already approved tuition rates for the

2026-27 term,[11] and the Board of Trustees of Southern Illinois University has done the same for

its medical school.[12] By the time the Court hears argument in May, it is likely that all applicable

defendants will have locked in tuition rates for the 2026-27 term. And once these rates are

established, students rely on them to make life-altering decisions. To avoid the serious

---

[11] Alex Quigley, "Modest tuition increases approved for incoming freshmen at U of I System universities"
(Jan. 15, 2026), news.uillinois.edu/view/7815/1273775275.

[12] SIU Board of Trustees Meeting, "Board of Trustees Meeting 2/5/26" at 2:21:46-2:22:50, youtube.com/
watch?v=ksGZmGBh8Uo; *see* Board of Trustees of Southern Illinois University, "Agenda" ¶ K (Feb. 5,
2026), siusystem.edu/board-of-trustees/meetings/2026/AgendaWebMaterials1.2026.pdf.

disruptions that last-minute changes to tuition rates will inevitably cause, and to ensure that affected institutions and students have sufficient time to prepare for new rates, any injunction that the Court may issue should begin to apply, at the earliest, in the 2027-28 term.[13]

Finally, any injunction the Court may issue should be stayed pending appeal—or at the very least administratively stayed for 30 days so defendants may seek relief in the Seventh Circuit. *See, e.g.*, *Barnett v. Raoul*, 756 F. Supp. 3d 564, 660 (S.D. Ill. 2024) (staying permanent injunction for 30 days). A stay will "minimize the costs of error" and is "necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on its merits." *In re A & F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014); *accord United States v. Texas*, 144 S. Ct. 797, 798-99 (2024) (Barrett, J., concurring) ("administrative stays" are "a flexible, short-term tool" that "do not typically reflect the court's consideration of the merits" but rather serve "to minimize harm while an appellate court deliberates").

The potential for error and interim damage are heightened here. The federal government's claims present novel and complex legal questions that are simultaneously being considered by courts all over the country. And the answers to those questions will affect tens of thousands of students enrolled at Illinois colleges and universities whose lives may be irrevocably changed for the worse by even a temporary imposition on their ability to afford an education.

## CONCLUSION

The Court should grant defendants' motion to dismiss, ECF 18, and deny the federal government's motion for summary judgment, ECF 26.

---

[13] If the federal government's summary judgment motion remains pending in January 2027, when some defendants will begin setting tuition rates for the 2027-28 term, any injunction that the Court may issue at that time should begin to apply, at the earliest, in the 2028-29 term.

Dated: February 20, 2026

Respectfully submitted,

/s/ Darren Kinkead
Darren Kinkead
Aleeza Strubel
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov